**Cheryl R. CHURCHILL, Plaintiff,**

v.

**Cynthia WATERS, Kathleen Davis, Stephen Hopper and McDonough District Hospital, Defendants.**

**No. 87–1117.**

United States District Court, C.D. Illinois.

Feb. 16, 1990.

**312**

John H. Bisbee, Macomb, Ill., for plaintiff.

Janet L. Jannusch, Keck, Mahin & Cate, Peoria, Ill., and Larry Manson, Keck, Mahin & Cate, Chicago, Ill., for defendants.

## ORDER

MIHM, District Judge.

Plaintiff Cheryl Churchill has sued the Defendants pursuant to 42 U.S.C. § 1983 and Illinois law, alleging that termination of her employment as a nurse at McDonough District Hospital violated her First and Fourteenth Amendment rights, as well as breaching her employment contract. Specifically, in Count I, Plaintiff charges the individual Defendants with violation of her First Amendment rights. Count II charges the individual Defendants with violation of her Fourteenth Amendment rights to due process. Count III alleges that the hospital violated her First Amendment rights. Count IV alleges a common law breach of contract against the hospital.

Argument was heard on Defendants' Joint Motion for Summary Judgment on December 20, 1989. For the reasons stated below, the Motion for Summary Judgment is granted as to the Fourteenth Amendment claims and the state law contract claims. The Motion is denied as to the First Amendment claim because of the existence of disputed issues of material fact.

## FACTS

Cheryl Churchill was hired as a part-time nurse in Obstetrics by McDonough District Hospital (hereinafter "MDH") on October 25, 1982. On September 16, 1985 she began work as a full-time nurse in Obstetrics. On January 27, 1987 she was discharged by the hospital.

In April of 1986 Defendant Kathy Davis was hired by MDH as Vice–President of Nursing. Soon after her appointment, Davis made a number of changes in nursing practices, including the implementation of what is known as "cross-training." Cross-training involved pulling full-time nurses from general medical areas of the hospital and training them in more specialized nursing areas, such as obstetrics, so that the cross-trainees could provide flexible staffing as needed. The institution of this new policy was rather controversial, triggering a certain amount of controversy and discussion among medical and nursing staff at the hospital.

Among those opposing cross-training was the Plaintiff, while the individual Defendants all supported it. According to Churchill, she participated in a number of conversations about cross-training with other staff of the hospital.

On August 21, 1986 a medical emergency ("code pink") developed in the Obstetrics Department. The doctor on duty was Thomas Koch, M.D., the clinical head of the Obstetrics Department. A probationary

employee, Mary Lou Ballew, was ordered by Dr. Koch to sound the alert for the "code pink." She did not know what to do and failed to alert all the necessary medical personnel. Koch directed Churchill to prepare the delivery room for the impending emergency Caesarean Section and then himself secured the "code pink" alert.

During the surgical procedure, Defendant Cynthia Waters arrived in the delivery room. She asked Churchill about one of Churchill's patients who had recently delivered and was in the recovery room. Churchill checked on the patient and returned to the delivery room. Once again, Waters asked her about her patient. In response, Churchill said, "You don't have to tell me how to do my job." At that point, Dr. Koch reprimanded Waters, informing her that she was out of line in interfering with his orders to Churchill. Nonetheless, Churchill left the delivery room. After the operation, Dr. Koch again approached Waters to discuss her conduct. Waters, however, would not discuss the matter with Koch. Instead, she contacted Defendant Stephen Hopper, the President and CEO of MDH.

Subsequently, Hopper held a conversation with Koch and Waters, as well as another nurse, Marsha Clausen. Dr. Koch not only complained about Water's behavior, but expanded the conversation to include general complaints about the new nursing policies implemented by Davis and Waters.

Kathy Davis, who had been unavailable for that meeting, was contacted by Hopper and Waters later. Hopper, Davis, and Waters met on August 22 and August 25, 1986, and decided to issue a written warning to Churchill for insubordination based on her response to Waters in the delivery room. The written warning was presented to Churchill on a special form on August 25. The warning read as follows:

REASON FOR WARNING: (1) Insubordination—when had to be asked twice to leave the delivery room, you responded to me [Waters] in a very hostile manner, "I don't need you to tell me how to do my work." (2) General negative attitude and lack of support toward nursing administration in the OB Department.

WARNING GIVEN: Insubordination and/or lack of cooperation will not be tolerated in the future as it is very detrimental to the operations of the OB Department. Any future occurrence of this behavior will be subject to further disciplinary action which may include assignment to another nursing area or discharge.

In Churchill's deposition she acknowledged that, although she could have submitted a written response, she chose not to do so saying that she did not wish "to make mountains out of molehills." She also did not file a grievance protesting this warning.

On January 5, 1987 Churchill received her annual evaluation from Waters. The evaluation showed standard or strong performances in every area of the evaluation and reflected no areas of weakness. At the end of the evaluation, Waters wrote:

Cheryl exhibits negative behavior towards me and my leadership—through her actions and body language, i.e. no answer, one word abrupt answers followed by turning and leaving, blank facial expressions, or disapproving facial expressions. This promotes an unpleasant atmosphere and hinders constructive communication and cooperation.

In the conversation between Churchill and Waters which accompanied the evaluation, Waters did not mention the handwritten comments at the end of the evaluation, and Churchill made no response either orally or in writing nor did she file a grievance.

On January 16, 1987 Cheryl Churchill began work on the 3:00 to 11:00 p.m. shift. The nurse in charge was Jean Welty. Other nurses working the same shift included Mary Lou Ballew and Melanie Perkins–Graham. Following departmental custom, Churchill and Perkins–Graham were eating their dinner in a kitchen area situated behind the main nurse's station in Obstetrics. Ballew and Welty were at the main desk. Dr. Koch walked into the department and went into the kitchen area where Churchill and Perkins–Graham were eating. Welty

remained at the front desk while Ballew (the nurse present in the delivery room during the previously discussed incident involving Churchill, Koch and Waters) heard parts of the subsequent conversation in the kitchen; however, she was not at the desk or in the kitchen area for the entire course of the conversations since she was answering patient lights and performing other nursing duties.

Perkins–Graham told Koch that she was in the department for cross-training and was thinking about transferring to Obstetrics permanently. The subsequent conversation involved general criticisms and comments about the cross-training policy. Welty overheard Koch express his general views about cross-training and his reasons for disliking that policy. She also heard Churchill agree with Koch and say that Kathy Davis' policy was going to "ruin the hospital," and that some aspects of the cross-training program might violate certain state regulations. Welty also heard Perkins–Graham contribute her views to the conversation, and indicate that, while she was interested in transferring to the OB Department, she was reluctant because she had heard so many bad things about Cindy Waters. Welty heard Churchill encourage her to transfer, saying that Cindy Waters had a hard job but good intentions and that she was sometimes moody.

Ballew overheard only segments of this conversation. Apparently, she construed those portion she heard as negative and intended to dampen the enthusiasm of the cross-trainee, Perkins–Graham. Because of this, Ballew reported the conversation to Waters, who went to Hopper on January 21 and advised him of the conversation. Hopper, who wanted to include Kathy Davis, held a meeting the next day at which Davis, Waters, and Hopper decided to talk to Perkins–Graham. On January 23, Perkins–Graham was summoned to Davis' office. When she arrived, accompanied by her supervisor, she agreed that Churchill had said unkind and inappropriate negative things about Cindy Waters and had said that things in general were not good in OB as a result of hospital administration policies. She repeated Churchill's comment about Kathy Davis "ruining the hospital" but admitted that she could not remember the conversation very specifically.

On January 26, 1987, Waters, Davis, Hopper, and Bernice Magin (Personnel Director of MDH) held a meeting at which they decided to discharge Churchill. The next day when Churchill arrived at work, Waters summoned her to Davis' office. There, Churchill was advised by Waters that, because she had continued to undermine the department and the hospital administration, Waters had no choice but to fire her. Bernice Magin explained how Churchill's benefit package would work following her discharge, discussed her final paycheck, and later explained to her the grievance procedure at the hospital.

Pursuant to the hospital's grievance procedure, Hopper reviewed the grievance Churchill filed. Churchill did not know and was not told of Hopper's involvement in the decision to fire her. Hopper decided that there had been three warnings beginning with the written warning following the delivery room incident. The second warning, he concluded, was the written criticism at the end of the Churchill's evaluation. He concluded that Churchill's conversation on January 16 was a third offense within 12 months and therefore upheld the discharge.

At his deposition, Hopper testified that he found Churchill's comments about Davis and Waters objectionable not only because of their negative, insubordinate content, but also because she was voicing her concerns during working hours to the wrong forum. He viewed Churchill's conflict with Waters as a personal dispute which interfered both with department operations and with the hospital's cross-training policy.

At the time Churchill was first hired by MDH on a part-time basis, she was given a copy of the hospital's written statement of its employee relations guidelines, entitled Statement of Wages, Hours, and Employee Relations Practices–Human Resources Practices (hereinafter "handbook"). A number of provisions in the handbook are very important to this case.

First, on page 5, the handbook states its purpose including in relevant part the following:

The intent of these Human Resources Policies is to set forth all those basic matters regarding conditions of employment, rates of pay and hours of work to be observed by both the hospital and by all those employees covered by this Statement of Purpose.

The conditions and procedures established in these policies are intended to spell out the mutual employment relationship between the hospital and its employees, so as to assure:

1. Complete cooperation of all hospital personnel, and

2. Fair adjustment of any differences that may arise in the employee-employer relationship.

Scheduling and assigning of work, the direction of the hospital staff, its expansion and reduction, the control and location of operations including when, where, and by whom work shall be performed, and the determination of the means, methods, processes, schedules and standards of performance are the responsibility of the hospital.

Enactment of these responsibilities by the hospital will be completed within the specific and expressed outlines as provided in these policies ...

The mutual interest of all employees and the hospital calls for the continued successful promotion and development of unexcelled patient care. The basic purpose of this statement is to contribute toward such goals through the observance by both the hospital and each employee of the provisions and intent of these Human Resources Practices.

The next page of the handbook is a letter from Hopper in which he emphasized that, although the hospital's primary aim was to provide outstanding medical care, the main factor in successfully achieving that aim was the hospital's employee:

An employee must not only do a good job, but should enjoy doing that job. Satisfied employees are men and women who TAKE PRIDE in their work, who feel their jobs are WORTHWHILE, and who know their efforts and their work is RECOGNIZED. In recognition of these human values, we have established the following Human Resources objectives:

. . . . .

9. To respect the individual employee's rights and assure employees of their right to freely discuss with supervision any matter concerning their own or the hospital's welfare....

. . . . .

To implement these aims in a spirit of friendliness and cooperation, we have established Human Resources Policies which are put into effect through systems and procedures. We believe that neither the hospital nor its employees can succeed unless these objectives, these policies, and these procedures, are known, understood, and observed by all. [emphasis in original]

Article I of the handbook is entitled General Information. In Section 1.05, it provides:

Insofar as practical, exceptions to these Practices will be avoided. These Human Resources Practices will be periodically reviewed and adjustments will be made based on practices of other employee units in the area, as well as other economic considerations. Should an exception to these Human Resources Practices be in order, the request in writing, for approval for such an exception should be made; and the approval received from the President/CEO or his designate.

Section 1.06 provides:

These Human Resources Practices are provided to insure that all personnel understand their respective roles and responsibilities, and that each employee covered by these Practices is afforded job security and means of redress, should a misunderstanding occur between the employee and his/her immediate supervisor.

*The contents of this handbook are presented as a matter of information only and the language contained herein is not intended to constitute a con-*

*tract between McDonough District Hospital (MDH) and you, the employee.*

Except for the necessary rules and regulations regarding expected conduct and behavior, the plans, policies and procedures described herein are not to be considered conditions of employment. MDH retains the rights to change, revoke, suspend, modify or terminate any or all such plans, policies, and procedures in all or in part at any time with or without notice. [emphasis in original].

Article II of the handbook is called Employment Status. In § 2.01, entitled "ESP" (Employment Security Policy), the handbook states that MDH "offers each employee 'Job Security' based on your productivity, the quality of your work and your loyalty to the hospital." Article II goes on to define four different types of employee and states that all new or rehired employees are characterized as probationary during the first ninety calendar days of continuous employment. Section 2.04 states that "During the Probationary Period, termination of employment may be made without prejudice to either the employee or the hospital. Thus, no notice of termination by either the Hospital or the employee during the Probationary Period will be necessary."

Section 2.06 provides that an employee's employment can be terminated for six reasons: discharge for cause, voluntary resignation, retirement, layoff, failure to report to work following a layoff, unreported or unverifiable absences for three days or more. Discharge for cause is not defined in Section 2.06.

Article IX of the handbook, entitled Resolving Differences, states that the procedure in Article IX provides "the sole and exclusive remedy for any employee who believes the hospital has violated these Human Resources Practices in any way." Section 9.02 reassures that grievances may be expressed without fear of prejudice or reprisal.

The grievance procedure set out in Section 9.03 consists of three steps. Step 1 is departmental review. It requires that the employee present in writing to his or her departmental director the claim. The director is to consider the problem and attempt to reach a settlement within 7 calendar days.

If step 1 does not resolve the problem, the complaint proceeds to step 2 which is administrative review. This step requires that the employee present the grievance in writing to the Vice–President of Human Resources who is to hold a conference with the employee, the Vice–President In Charge and the Vice–President/Human Resources. The problem is to be considered by the Vice–President In Charge and settlement is to be attempted.

If there is no resolution within 7 days, the employee is to proceed to step 3 at which time the grievance is presented to the hospital President/CEO in writing. The President is to conduct a thorough investigation and deliver a written decision with 10 days. Article IX provides that the President/CEO's decision shall be final and binding for all purposes on the employee and the hospital.

Article IX also provides that if the subject of the employee's complaint is the employee's department director, the employee may proceed directly to step 2. In the case before the Court, the employee was permitted to proceed directly to step 3 since her complaint not only concerned her department director but also the Vice–President In Charge.

Article X of the handbook, entitled Discipline, sets forth general guidelines for discipline of employees. The important sections are set forth below. In all the below guidelines, emphasis has been added to call attention to precatory and mandatory language.

**10.02 DISCIPLINE AND CODE OF CONDUCT**

Any time a group of people work closely together in a business situation, there must be some guidelines and rules to assure a safe, efficient business operation: to assure compliance with the public law; and to protect the well-being and rights of patients and of all employees. Many of the MDH rules will be readily understood and observed by individuals

who qualify for MDH employment, since they are the same rules which guide behavior in relationships with other people anywhere in any social or business relationship. Other work rules and practices are more applicable to people working together in the health care environment of McDonough District Hospital.

Discipline, whether a warning, suspension or discharge is given for the purpose of preventing a recurrence of behavior which is unacceptable. It is in no sense designed to humiliate or retaliate. *In every case*, the employee *shall be given* ample opportunity to state his case and discuss his point of view.

At the first indication that any MDH employee is becoming lax in following our practices and work rules, but where formal disciplinary action is not indicated, the employee's Department Director/Supervisor *will discuss* the situation with him/her to insure a clear understanding of what is expected. Should the employee fail to correct the situation, the Department Director/Supervisor *may* then decided to take formal disciplinary action.

10.02 DISCIPLINE—GENERAL GUIDELINES

a. Discipline *may be* initiated for various reasons including, but not limited to, violations of work rules, insubordination or poor job performance. The severity of the action depends on the nature of the offense, and the employee's record, and *may range* from verbal counseling to immediate dismissal.

b. The *normal* progressive discipline procedure consists of:

1. Verbal counseling
2. First written warning
3. Final written warning, which may include suspension
4. Discharge

Any or all of these steps *may be* utilized, depending upon individual circumstances and the nature of the infraction. Moreover, exceptions or deviations from the normal procedure *may occur* whenever Administration deems appropriate.

c. Progressive discipline must be timely and should follow, as closely as possible, the incident requiring the disciplinary action.

10.03 PROGRESSIVE DISCIPLINE

a. With the exception of offenses requiring more stringent action, employees will *normally* be counseled once verbally before receiving a written warning.

b. In the event of another performance problem or a violation of any hospital policy, a written warning will *ordinarily* be issued.

1. The warning *should* be signed and dated by the employee ...

2. The warning *should* inform the employee of the possible consequences, including final written warning, suspension and/or discharge, should additional violations or performance problems occur ...

c. If a third offense occurs within twelve (12) months of the previous written warning, a final warning *should* be issued.

d. If the employee violates a hospital policy or fails to improve performance, termination *may* result.

McDonough District Hospital *reserves the right to deviate* from this policy when circumstances warrant such a deviation.

Formal disciplinary action *shall be applied* by management *according to the circumstances* and the offense involved in each individual case.

The next section lists several examples (explicitly *not* all-inclusive) of offenses for which a written warning will "ordinarily" be issued. One of those offenses is the failure to carry out a supervisor's specific instructions. None of the other examples are relevant to this case.

The next section sets out offenses which are of such a nature that they *may* result in suspension without pay. In addition, the handbook states that repetition of one of these offenses will *usually* result in discharge. The example includes willful refusal to obey a supervisor. None of the other examples are pertinent.

The final section in Article X lists examples of action and behavior that normally warrant discharge without prior warning. None of the examples are relevant to this case.

Finally, in Article XII, Section 12.01, entitled Reservation of Rights, the handbook states:

> It is impracticable, and probably impossible, to attempt to set forth in these Human Resources Practices answers to all the possible employment problems which may arise. Further, it is essential to effective operation of the Hospital that Hospital management retain the responsibility and right to direct and manage the Hospital and the staff in the manner the Hospital considers best designed to carry out the Hospital's health care delivery obligations. Therefore, *except to the specific extent that a subject with respect to the employment relationship is covered in this Statement of Human Resources Practices, the Hospital expressly retains the right to take any action which does not conflict* with the provisions of this Statement of Human Resources Practices or applicable law. [emphasis added].

### FOURTEENTH AMENDMENT DUE PROCESS CLAIM

■ In their Motion for Summary Judgment, the Defendants argue first that Churchill had no property interest in her employment under Illinois law. The Defendants correctly point out that under Illinois law, the Plaintiff must show that the handbook created a legally enforceable expectation of continued employment pursuant to *Duldulao v. St. Mary of Nazareth Hospital*, 115 Ill.2d 482, 505 N.E.2d 314, 106 Ill.Dec. 8 (1987).

In *Duldulao*, the Illinois Supreme Court ruled that a handbook creates enforceable contract rights where the traditional requirements for contract formation are present. First, the language of the policy statement must contain a promise clear enough that an employee could reasonably believe that an offer had been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, an employee must accept the offer by commencing or continuing to work after learning of the policy's statement. *Id.* 505 N.E.2d at 316, 106 Ill.Dec. at 10.

In *Duldulao*, the court found that the employee handbook had created enforceable rights because there were very clear promises made. For example, the handbook stated it was designed to "clarify your rights" and that after probation an employee would become a permanent employee and "termination ... cannot occur without proper notice and investigation." In addition, it stated that "permanent employees are never dismissed without prior written admonitions and/or an investigation" and that "three warning notices ... are required before an employee is dismissed." 505 N.E.2d at 316, 106 Ill.Dec. at 10. In addition, the handbook sets out a list of examples which would justify immediate dismissal without notice and another list of offenses which were specifically not subject to immediate dismissal. The court held that an employee reading the handbook would reasonably believe that, except in the case of the specific listed offenses, he or she would not be discharged without prior written warnings. *Id.* 505 N.E.2d 319, 106 Ill.Dec. at 13.

The court also considered it significant that the handbook contained no disclaimer to negate the promises made. To the contrary, the introduction to the handbook stated that the policies in the handbook "are designed to clarify your rights and duties as employees." *Id.*

The legal impact of a disclaimer was further examined in the case of *Yocum v. Show Biz Pizza Time, Inc.*, No. 88–3128, (N.D.Ill. Feb. 21, 1989) (1989 WL 15961). In that case, the employee handbook outlined the guidelines and policies of employment, provided specific employee rules, and spelled out which violations would result in immediate dismissal and which would result in a lesser form of remedial action. In addition, the handbook contained a conspicuous disclaimer reading "Our relationship

is, and always will be, one of voluntary employment 'at will.' " The court first refused to find that the handbook promised that employees could only be fired for cause, stating that "a negative inference ... certainly cannot provide the basis for the type of clear promise that *Duldulao* contemplated." *Id.* at 4. In addition, the court held that the clear language of the disclaimer meant that it would be unreasonable for a plaintiff to believe that he was being offered a job in which he could be fired only for cause. *Id.*

In *Doe v. First National Bank of Chicago*, 865 F.2d 864 (7th Cir.1989), the Seventh Circuit also considered a disclaimer contained in an employee handbook. The disclaimer stated in full "Neither this policy nor any provision of this policy manual is intended to set forth the terms and conditions of an individual's employment or termination of employment, to constitute a contract of employment, or to confer any additional employment rights. Employment can be terminated at any time and for any reason by either the employee or FCC." *Id.* at 873.

In addition to the handbook, the employees in *Doe* received a memorandum which described major and minor offenses and which provided that employees could be disciplined or discharged for the listed misconduct but which never promised that specific disciplinary procedures would be used.

The Seventh Circuit held that the employee manual, in combination with the memorandum, did not create enforceable rights. Specifically, the Court held that the manual could not as a matter of law constitute a contract since

> We fail to see how a document which clearly disclaims in unambiguous language any purpose to bind the parties can constitute a promise clear enough that an employee would reasonably believe that an offer has been made. [citation omitted].

*Id.* Thus, the basis for the Seventh Circuit's finding was a failure to find an intent to be bound which, after all, is what an offer of contract is.

A comparison of the handbooks in *Duldulao* and *Doe* with MDH's handbook leads the Court to conclude that MDH did not make any promises sufficiently clear that it would have been reasonable for Churchill to believe it was an offer. Specifically:

In *Duldulao*, there was no disclaimer, while in *Doe*, as in this case, there is one. Plaintiff argues that the disclaimer here is a legal conclusion, i.e. since under Illinois law such legally conclusory language is insufficient to form the existence of a contract, the opposite must also be true; if the disclaimer does not assert that employment is *at-will*, then the statement that no contract is intended cannot be construed to bar contract formation.

The Court disagrees for several reasons. First, the disclaimer expressly disavows any intent to be bound, which was the factor on which the Seventh Circuit relied in *Doe*. Second, the disclaimer doesn't *only* say that there is no contract intended, as Plaintiff claims. Rather, it says that the contents are "presented as a matter of information only," which belies any intent to be bound. Third, in the paragraph immediately after the disclaimer, the handbook states that its contents are not to be considered conditions of employment, as did the disclaimer in *Doe*.

Most importantly, however, Plaintiff assumes that this disclaimer is inconsistent with the rest of the policy, and that, in its absence, Plaintiff's property right would be clear. This assumption is incorrect.

In *Duldulao*, the letter from the hospital president to employees stated that the policies were designed to clarify their *rights*. In *Doe* (although this factor was not discussed), the policy manual spoke in terms of "guidelines." In this case, the contents of the handbook are referred to alternatively as Policies, Practices and Guidelines.

In *Duldulao*, the procedures for discipline were emphatically mandatory: "never dismissed," "required," "cannot occur." In *Doe*, the Court noted that the precatory language contained no promise that specific procedures would be used. In this case, Article X (Discipline) is written entirely in language which is obviously intended to

suggest guidelines and nothing more ("may be," "normal procedures," "ordinarily," "should"). It is accompanied by explicit reservations: exceptions are allowed under § 10.02(b) whenever administration deems appropriate; MDH reserved the right to deviate from the progressive discipline policy when circumstances warrant under § 10.03; in Article XII, MDH reserved its right to take any action which does not conflict with a specific portion of the handbook.

There are some aspects of the handbook which might, if read in isolation, seem to indicate an offer. For example, Plaintiff claims that MDH explicitly *offered* job security, a promise missing in both *Doe* and *Duldulao*. She relies on § 2.01 which does indeed use the word "offer." However, that single word cannot be read in isolation. Nor can an "offer of job security" be any more than a general statement; it is certainly *not* a clear promise.

As a whole the handbook simply does not constitute a promise clear enough for an employee to reasonably believe that an offer was made. *See also, Harrell v. Montgomery Ward & Co.*, 189 Ill.App.3d 516, 545 N.E.2d 373, 136 Ill.Dec. 849 (1st Dist. 1989) (holding that the existence of a promise is a question of law to be determined by the court); *Tolbert v. St. Francis Extended Care Center*, 189 Ill.App.3d 503, 545 N.E.2d 384, 136 Ill.Dec. 860 (1st Dist.1989) (holding that an employer's promise not to discharge except for just cause is not a sufficient promise to constitute an offer); *Koch v. Illinois Power Co.*, 175 Ill.App.3d 248, 529 N.E.2d 281, 124 Ill.Dec. 461 (3rd Dist.1988), app. denied 535 N.E.2d 915, 129 Ill.Dec. 150 (1989) (general statements and guidelines for discipline could not reasonably be construed as an offer); *Mursch v. Van Doren Co.*, 851 F.2d 990 (7th Cir.1988) (repeated use of non-mandatory language evinces a clear intent not to create a binding agreement).

For this reason, Churchill had no enforceable property interest granted to her by the handbook. Absent a property interest in continued employment, Plaintiff cannot proceed on her due process claim and sum-

mary judgment would be proper on this basis alone.

■ Even if, however, this Court had found that Churchill had a property interest in continued employment, several recent Seventh Circuit cases would mandate dismissal of her due process claim.

In *Easter House v. Felder*, 879 F.2d 1458 (7th Cir.1989), the court discussed the Supreme Court's recent pronouncements in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), in which the Supreme Court held that a random and unauthorized intentional deprivation of property by a state employee does not constitute a violation of procedural due process if a meaningful post-deprivation remedy is available. The underlying principle of *Parratt* was to prevent turning the Fourteenth Amendment into "a font of tort law to be superimposed into whatever systems may already be administered by the state." *Id.* at 544.

In *Easter House*, the plaintiff contended that *Parratt* did not apply where the property deprivation had resulted from actions of high level state and local officials engaged in a conspiracy to violate a citizen's constitutional rights. The Seventh Circuit first found that a conspiracy could be a random act, if, from the point of view of the state, the state could not have anticipated or controlled the conduct in advance. 879 F.2d at 1469.

Next, the Seventh Circuit considered whether actions of high level state employees could ever be characterized as random or unauthorized. The Seventh Circuit held that the relevant inquiry was whether those employees' actions were random and unauthorized from the *state's perspective*, regardless of the level of the employee in the governmental hierarchy. In other words, a random act by a high ranking state employee who has disregarded the state's formal policy or established procedure does not necessarily translate into a deprivation of due process. The process provided by the state *as a whole* must be examined. Thus, there is a distinction between a claim which challenges the adequacy of the state's policy or procedure itself

and a claim that a high ranking state official disregarded otherwise adequate process.

Only where the state has delegated the power to make policy and procedure to a specific policymaker, and that policymaker establishes procedure on an informal case by case basis without any formal policy or procedural guidelines from the state, can that policymaker's random and unauthorized actions be attributed to the state itself. *Id.* at 1472.

After concluding that a high ranking official's conduct can be random and unauthorized, the Seventh Circuit proceeded to apply *Parratt* to determine whether the post-deprivation procedures available comport with due process. The Seventh Circuit noted a number of legal theories available under Illinois law which would provide relief to Easter House, concluding that adequate state remedies existed to correct any injuries which may have resulted from improper conduct. Under the principles of *Parratt,* that is sufficient enough to provide adequate due process. *See also, Thornton v. Barnes,* 890 F.2d 1380, 1389 (Moody, J. 1989) (holding that state tort remedies are sufficient post-deprivation relief to satisfy due process).

Under the reasoning of *Easter House,* it becomes very important to examine the procedures of the state as a whole, as well as the underlying basis for the due process claim. The analysis is very different if the claim is that the state's procedures as a whole are constitutionally inadequate than it is if the argument is that a state official failed to follow otherwise constitutionally adequate procedures.

The Fourth, Fifth and Sixth Circuits have subsequently interpreted this aspect of *Parratt* as meaning that, if a state system by procedure and ordinary practice, does in fact provide a party with due process, there is no violation of the Fourteenth Amendment merely because of a random deprivation without the hearing required under state law. *See Holloway v. Walker,* 790 F.2d 1170 (5th Cir.1986); *Fields v. Durham,* 856 F.2d 655 (4th Cir.1988); *National Communications Sys. Inc. v. Michigan Public Service Comm'n,* 789 F.2d 370 (6th Cir.1986).

In the case before the Court, Churchill's due process claim is that the hospital's policy requires supervisors to provide notice and an opportunity to present their case and discuss their point of view. Thus, the claim is *not* that the state's procedures themselves are constitutionally inadequate but rather that Waters, Davis and Hopper failed to follow the established policy. Such a claim is not cognizable under § 1983 if there are adequate post-deprivation remedies, per *Easter House* and *Thornton.*

Plaintiff argues that because the hospital's policy provides Hopper with the authority to make a final and binding decision, there are no adequate remedies. This argument ignores the state law remedies which were found adequate in both *Easter House* and *Thornton.* Because Illinois law provides at least one remedy (breach of employment contract, *see Duldulao* ) Churchill has adequate post-deprivation remedies to satisfy due process concern.

This conclusion is consistent with the policies which underlie *Parratt* and *Easter House.* Both of those cases stemmed, at least in part, from the Court's concerns that § 1983 not be allowed to become a font of tort law. Here, where the state does provide a cause of action, allowing Plaintiff to proceed with her constitutional claim would be inconsistent with that concern.

Thus, the individual Defendants' Motion for Summary Judgment on the due process claim (Count II) is granted either because the Plaintiff has not established and cannot establish that an employment contract was created by the policy handbook, or because Illinois provides a meaningful post-deprivation remedy which satisfies due process.

## BREACH OF CONTRACT

The *Duldulao* analysis is identical under the Plaintiff's state law claim for breach of employment contract as it was under her due process claim. Absent proof that the handbook contained clear promises which

**322**

indicated an intent to bind the parties, no contract was created.

Thus, for the same reasons as stated above, Defendants' Motion for Summary Judgment relating to the state law claim for breach of employment contract (Count IV) is granted.

### FIRST AMENDMENT

Because of the existence of material factual disputes, Defendants are not entitled to summary judgment on the First Amendment claim. The Motion for Summary Judgment on Counts I and III is therefore denied.

This case is hereby set for a telephonic status conference with Magistrate Kauffman on March 12, 1990. The Court will initiate the call.