ORDER
 

 McCUSKEY, District Judge.
 

 On August 13, 1998, Plaintiff, Dan Long, filed a Complaint (# 1) against Defendant, Illinois Municipal Electric Agency (IMEA). Long alleged that he was entitled to damages pursuant to 42 U-S.C. § 1983 because
 
 *183
 
 he had a property interest in continued employment with IMEA and he was terminated in violation of his procedural due process rights. Long also claimed that he was entitled to damages under Illinois law for breach of contract. On August 6, 1999, IMEA filed a Motion for Summary Judgment (# 15). Long also filed a Motion for Summary Judgment as to three of IMEA’s Affirmative Defenses (# 19). Following a careful review of both IMEA’s and Long’s arguments and all of the documentary evidence presented by the parties, IMEA’s Motion for Summary Judgment (# 15) is GRANTED. Because judgment is entered in favor of IMEA as a matter of law, Long’s Motion for Summary Judgment on IMEA’s Affirmative Defenses (# 19) is DENIED as moot.
 

 FACTS
 

 Long began working for Central Illinois Public Service Company (CIPS) in January 1978. In 1995, CIPS was going through a merger. Long spoke to Frank Madonia, the General Manager of IMEA, sometime after he heard about the merger in August 1995. At Madonia’s request, Long sent a letter to Madonia on September 8,1995, in which Long set forth his job skills and what he could offer to IMEA. At that time, Madonia told Long that IMEA did not have any existing openings. In October 1995, Long and Madonia both attended a function in Peoria. Long told Madonia that he had been assured that his job was not going to be eliminated following the merger. Long then agreed to Madonia’s request that he contact Madonia before he did anything. In early 1996, Long called Madonia and told Madonia he was not sure he wanted to stay at CIPS after the merger. Long testified at his deposition that he was concerned that things could get worse at CIPS after the completion of the merger. He also stated that he wanted to stay in Springfield.
 

 In July 1996, Madonia asked Long to come to IMEA to talk to a few of IMEA’s Board members about what he had to offer. Madonia then offered Long a position with IMEA as Assistant General Manager. This was a new position created for Long. The executive board of IMEA had voted to hire an additional employee as Assistant General Manager. Long received a letter from Madonia formalizing the job offer. The letter was dated July 19, 1996, and set out Long’s starting salary and benefits package. The letter also stated, “[t]he first six months of employment is a probationary period and either the employee or employer may terminate employment without any adverse effect on the employee’s record and the employer shall be held harmless.” Long also received a copy of IMEA’s Employee Policy and Procedures Manual (policy manual). Long testified that he read the policy manual from cover to cover.
 

 The policy manual included a statement that “[pjersons hired by IMEA shall be subject to an informal probationary period during the first six (6) months of their employment.” Long testified that he discussed the probationary period with Mado-nia because he “didn’t see a very good explanation of that in the manual.” Long stated that Madonia told him that “it just means that after six months, they’ve got to have a reason to get rid of you.” Long accepted the offer of employment and began working for IMEA on August 26, 1996. IMEA is a municipal corporation and is a public employer.
 

 On April 7, 1997, Long received a letter from Madonia which stated that he would be given a 3.08% raise effective May 1, 1997. May 1 was the beginning of IMEA’s fiscal year. The letter also stated that Long would receive a one-time bonus of $2,100. The letter stated that Madonia personally thanked Long for his “individual contribution to the team effort that has made the success of IMEA possible.”
 

 Beginning around June 1997, the executive board of IMEA had concerns regarding Madonia’s performance as General Manager. On August 27, 1997, the executive board held a meeting to discuss their
 
 *184
 
 concerns. George Q. Smith, the president of IMEA’s Board of Directors, was a member of the executive board. He testified that, at the meeting, they decided to ask Madonia to resign and take early retirement. Smith testified that the executive board felt that Long should go with him because Long was Madonia’s choice for Assistant General Manager. Several members of the executive board did not think that IMEA needed an Assistant General Manager. They wanted to let the new General Manager decide whether an Assistant General Manager was needed. Mado-nia was then called into the executive board meeting and agreed to retire, effective September 1, 1997. Madonia called Long into his office and told Long he was retiring and had been authorized to offer Long 30 days severance pay. When Long asked for an explanation, Madonia told him that the executive board wanted to take IMEA “in a new direction.” Madonia suggested that Long talk to the executive board. Long was allowed to address the executive board that day and “asked essentially what had happened, what had changed, what had I done.” Long testified that he was again told that they wanted to take IMEA in a new direction. He stated that was the only reason he was given. Ronald D. Earl became IMEA’s General Manager on January 1,1998. Earl has not hired an Assistant General Manager for IMEA and this position no longer exists.
 

 Long subsequently filed his Complaint in this court, and the case is before the court for ruling on the Motions for Summary Judgment filed by the parties.
 

 ANALYSIS
 

 I. SUMMARY JUDGMENT STANDARD
 

 Summary judgment shall be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c); see also
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial.
 
 Waldridge v. American Hoechst Corp.,
 
 24 F.3d 918, 920 (7th Cir.1994). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment.
 
 Adickes v. S.H. Kress & Co.,
 
 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party has the burden of demonstrating the absence of a genuine issue of material fact.
 
 Celotex Corp.,
 
 477 U.S. at 323, 106 S.Ct. 2548;
 
 Schmidt v. Runyon,
 
 20 F.Supp.2d 1246, 1248 (C.D.Ill.1998). “Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial.”
 
 Schmidt,
 
 20 F.Supp.2d at 1248. Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment.
 
 Debs v. Northeastern Ill. Univ.,
 
 153 F.3d 390, 394 (7th Cir.1998).
 

 II. FEDERAL § 1983 DUE PROCESS CLAIMS
 

 In order to make his due process claims, Long must establish that he had a property interest in his job of the sort that the Constitution protects.
 
 Border v. City of Crystal Lake,
 
 75 F.3d 270, 273 (7th Cir.1996). The Supreme Court has clearly stated that such property interests “are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....”
 
 Board of Regents of State Colleges v. Roth,
 
 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); see
 
 *185
 
 also
 
 Border,
 
 75 F.3d at 273. A person’s interest in a benefit, such as continued employment, constitutes “property” for due process purposes only if “there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit.”
 
 Perry v. Sindermann,
 
 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). A protected property interest in employment arises from those “rules or understandings that secure certain benefits and that support claims of entitlement to those benefits” and can be embodied in a statute, regulation, municipal ordinance, or an express or implied contract.
 
 Domi-ano v. Village of River Grove,
 
 904 F.2d 1142, 1147 (7th Cir.1990) (quoting
 
 Roth,
 
 408 U.S. at 577, 92 S.Ct. 2701); see also
 
 Border,
 
 75 F.3d at 273. The Supreme Court has directed courts to examine state law to determine whether a person’s interest in continued employment qualifies as a legally-protected property interest.
 
 Perry,
 
 408 U.S. at 602 n. 7, 92 S.Ct. 2694;
 
 Border,
 
 75 F.3d at 273.
 

 Because Long was employed in Illinois, this court looks solely to Illinois law to determine whether he had a property interest in his job.
 
 Border,
 
 75 F.3d at 273. Under Illinois law, employment contracts are presumed to be at-will and are terminable by either party.
 
 Kalush v. Deluxe Corp.,
 
 171 F.3d 489, 492 (7th Cir. 1999);
 
 McInerney v. Charter Golf, Inc.,
 
 176 Ill.2d 482, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1349 (1997). Further, an oral promise of permanent or lifetime employment is not enforceable because a writing is required. McIn
 
 erney,
 
 223 Ill.Dec. 911, 680 N.E.2d at 1351-52. However, the Illinois Supreme Court has held that “an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present.”
 
 Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,
 
 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314, 318 (1987). Accordingly, in some contexts, promises made in an employee handbook can give rise to a legitimate claim of entitlement sufficient to be protected as a property interest.
 
 Border,
 
 75 F.3d at 273. However, the language in a policy manual must be sufficiently strong and clear to rebut the at-will presumption.
 
 Border,
 
 75 F.3d at 274. The requirements for such a contractual obligation are:
 

 First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement.
 
 Duldulao,
 
 106 Ill.Dec. 8, 505 N.E.2d at 318.
 

 An employee who can demonstrate fulfillment of these three conditions will have a contractual property interest in employment.
 
 Border,
 
 75 F.3d at 273. However, if any of these elements is absent, no contract has been formed and the relationship is one of “at will” employment.
 
 Boulay v. Impell Corp.,
 
 939 F.2d 480, 482 (7th Cir.1991). The question of whether a contract exists is one of law for a judge to decide.
 
 St. Peters v. Shell Oil Co.,
 
 77 F.3d 184, 187 (7th Cir.1996);
 
 Boulay,
 
 939 F.2d at 482. Courts employ an objective test when determining whether a promise is clear enough so that an employee could reasonably construe it as an offer.
 
 Finnane v. Pentel of Am., Ltd.,
 
 43 F.Supp.2d 891, 899 (N.D.Ill.1999) (citing
 
 St. Peters,
 
 77 F.3d at 187).
 

 In this case, only the first
 
 Duldulao
 
 element is in dispute. Long first argues that he had a property interest in continued employment based upon the July 19, 1996, letter offering him employment. Long argues that the offer letter, by providing for an introductory probationary period, created an implied contract of just cause termination for Long’s employment. Long contends that “the express provision for probation in the offer letter, when cou
 
 *186
 
 pled with the representations of Madonia that after completion of the probationary-period IMEA would have to have a reason to terminate [Long],” created a reasonable expectation of continued employment with IMEA. Long relies on
 
 Robinson v. Ada S. McKinley Community Serv., Inc.,
 
 19 F.3d 359 (7th Cir.1994). This court concludes that
 
 Robinson
 
 does not support Long’s position.
 

 In
 
 Robinson,
 
 the plaintiff received a letter when she was hired which stated, “Please be advised that tenure is achieved after the successful completion of 6(six) months of service with our agency.”
 
 Robinson,
 
 19 F.3d at 360. In addition, the employer’s Personnel Policies Manual provided that “[p]ermanent employment status is attained upon successful completion of the tenure probation period with the Agency.”
 
 Robinson,
 
 19 F.3d at 360. The Seventh Circuit concluded that “[a]n employee offered ‘tenure’ and ‘permanent employment status’ after completion of a trial period would reasonably conclude that she had attained something more than an at-will status.”
 
 Robinson,
 
 19 F.3d at 361. Further, the Manual provided a mandatory disciplinary process and did not contain disclaimers to negate the promises made.
 
 Robinson,
 
 19 F.3d at 362-63. The Seventh Circuit held that, based upon these facts, “[a]n employee would thus reasonably believe that she could not be terminated without certain protections.”
 
 Robinson,
 
 19 F.3d at 363.
 

 In this casé, the letter stated, “[t]he first six months of employment is a probationary period and either the employee or employer may terminate employment without any adverse effect on the employee’s record and the employer shall be held harmless.” The letter did not state that Long would have “tenure” after the completion of the probationary period or that he would become a permanent employee. In addition, the policy manual just stated that there was an “informal probationary period.” Unlike
 
 Robinson,
 
 neither the letter nor the language in the policy manual regarding the probationary period contained an unambiguous promise of permanent employment. Therefore,
 
 Robinson
 
 is inapposite to this case. Long has not cited, and this court has not found, any Illinois authority which holds that a letter stating that employment is subject to a probationary period creates an implied contract of just cause termination. Because the letter contains no promise of continuing employment and no assurance that Long could be dismissed only for “just cause” (see
 
 Border,
 
 75 F.3d at 274), this court concludes that the letter did not contain “a promise clear enough that an employee would reasonably believe that an offer has been made” (see
 
 Duldulao,
 
 106 Ill.Dec. 8, 505 N.E.2d at 318).
 

 Moreover, even considering the letter in conjunction with Madonia’s statement that IMEA would have to have a “reason” to get rid of him after the six month probationary period, there was no clear promise that he could only be terminated for just cause. Madonia did not state that it had to be a “good” reason or a reason related to job performance. In short, Madonia’s statement can only be considered a vague and informal assurance, not a promise. See
 
 Tolmie v. United Parcel Serv., Inc.,
 
 930 F.2d 579, 581-83 (7th Cir.1991) (supervisor’s vague and informal assurance did not qualify as unambiguous promise because the statement’s general nature allowed any number of interpretations);
 
 Dougherty v. Akzo Nobel Salt Inc.,
 
 47 F.Supp.2d 989, 991 (N.D.Ill.1999) (oral statement could not be interpreted as a definite promise of continued employment). Accordingly, this court concludes that the July 19, 1996, letter did not create an implied contract of continued employment and that Long did not have a property interest in his employment at IMEA based upon the July 19,1996, letter.
 

 Long also relies upon the policy manual and argues that, under
 
 Duldulao,
 
 the policy manual created an enforceable contract providing that IMEA could only terminate his employment for just cause.
 
 *187
 
 Long contends that, like the situation in
 
 Robinson,
 
 the policy manual provides for a mandatory disciplinary process. The policy manual states:
 

 3.11 Disciplinary Action
 

 The tenure of every employee shall be contingent upon acceptable conduct and satisfactory performance of duties. IMEA shall maintain a progressive disciplinary procedure for its employees. The progressive disciplinary procedure shall be applicable in all cases for minor offenses. An employee may be suspended or discharged immediately for major offenses, such as theft or direct insubordination. The progressive disciplinary procedure shall not apply to Department Heads and Managers. Department Heads and Managers may be suspended or discharged at any time for good cause.
 

 Long claims that he had an implied contract for termination only for just cause based upon this provision. Long contends that, under the terms of the “Disciplinary Action” provision, he could be terminated only for just cause whether he was categorized as an “employee” or whether he was categorized as a “Manager.” This court disagrees. The policy manual clearly states that the progressive disciplinary procedure did not apply to Department Heads and Managers. The policy manual provides that “Department Heads and Managers may be suspended or discharged at any time for good cause.” An employee handbook or similar document creates enforceable contractual rights only when specific procedures have been prescribed by positive or mandatory language such as “shall” or “must” and not when the document uses permissive language such as “may” or “should.” See
 
 St. Peters,
 
 77 F.3d at 187;
 
 Boulay,
 
 939 F.2d at 482-83;
 
 Tzoumis v. Tempel Steel Co.,
 
 1999 WL 1101257,. at *7 (N.D.Ill.1999);
 
 Svigos v. Petry Television, Inc.,
 
 1996 WL 388416, at *2 (N.D.Ill.1996). Accordingly, the language of the policy manual related to “Department Heads and Managers” is permissive and does not create contract rights. See
 
 St. Peters,
 
 77 F.3d at 187-88 (use of word “may” makes language discretionary, not mandatory, and certainly not promissory);
 
 Lashbrook v. Oerkfitz,
 
 65 F.3d 1339, 1347 (7th Cir.1995) (permissive language that “Department Heads, with the approval of the Director, may dismiss any employee for just cause” did not mean that plaintiff could only be dismissed for just cause);
 
 Boulay,
 
 939 F.2d at 482-83 (because of use of terms “should” and “may be terminated,” manual contained no clear promise);
 
 Spight v. Safer Found.,
 
 1999 WL 184198, at *4 (N.D.Ill.1999) (use of word “may” rather than “shall” or “must” is suggestive, not mandatory). The policy manual simply does not say that Department Heads and Managers cannot be terminated except for good cause. See
 
 Border,
 
 75 F.3d at 274.
 

 Here, Long was the Assistant General Manager at IMEA. According to the Organizational Chart prepared after his position was created, Long reported only to the General Manager, who reported to the executive board. One employee, IMEA’s Computer Specialist, reported directly to Long. This court believes that Long could only be considered a “Manager” who was not entitled to the progressive discipline procedure.
 
 [1]
 
 As previously discussed, the policy manual clearly did not contain a promise that a “Manager” such as Long
 
 *188
 
 would not be terminated except- for good cause.
 

 However, even if Long could be considered an “employee” to whom the progressive discipline procedure applied, he did not have contract rights based upon the policy manual. While the policy manual uses mandatory language in reference to the progressive disciplinary procedure for minor offenses, the policy manual states that the progressive discipline procedure does not apply to major offenses. Further, the language following this provision includes a “non-exclusive list” of minor offenses and a “non-exclusive list” of major offenses. The policy manual states that, for activities which do not appear on either list, “it shall be the responsibility of the General Manager to determine, on a case by case basis, whether it is a minor offense, a major offense, or no offense at all.” In
 
 Czarnecki v. Claypool,
 
 2000 WL 284002, at *4-5 (N.D.Ill.2000), the district court concluded that an employee handbook which had similar provisions did
 
 not
 
 “include a promise that employees will be discharged only for cause.” The court based this decision on the fact that, under the terms of the handbook, discipline could be imposed for reasons other than those listed so that there was no limitation on the types of behavior which could be punished.
 
 Czamecki,
 
 2000 WL 284002, at *4. The court concluded that a “handbook will not create a clear promise where it provides the employer with at least some discretion over the process of determining when or how an employee is terminated.”
 
 Czarnecki,
 
 2000 WL 284002, at *5 (quoting
 
 Grottkau v. Sky Climber, Inc.,
 
 1995 WL 32611, at *15 (N.D.Ill.1995)); see also
 
 Tzoumis,
 
 1999 WL 1101257, at *7 (“lack of an explicit promise that the employee will not be terminated unless the indicated procedures are followed weighs against finding that a policy statement is a contract”);
 
 Campbell v. Northwestern Mem’l Home Health Care/Serv., Inc.,
 
 1998 WL 246403, at *5-6 (N.D.Ill.1998) (employer’s broad discretion to determine what constitutes serious misconduct “casts doubts on plaintiffs contention that the language is sufficiently clear and promissory to establish an enforceable right to progressive discipline”);
 
 Colella v. Marriott Int'l Inc.,
 
 1995 WL 562131, at *6 (N.D.Ill.1995) (handbook provision that employer may immediately discharge non-probationary employee for serious misconduct undermines certainty of progressive discipline policy);
 
 Cunningham v. DMI, Inc.,
 
 264 Ill.App.3d 101, 201 Ill.Dec. 802, 636 N.E.2d 1234, 1236 (1994),
 
 app. denied,
 
 157 Ill.2d 497, 205 Ill.Dec. 158, 642 N.E.2d 1275 (1994) (“[wjhile there is arguably some mandatory language concerning procedure, it is apparent when viewing the instant pohcy as a whole that .it does not rise to the level of an enforceable employment contract” because there is “no language indicating that an employee would only be dismissed for good cause shown or that the employee would never be dismissed without following the proper procedure”);
 
 cf. Gorman v. Robinson,
 
 977 F.2d 350, 357 (7th Cir.1992) (just cause provision accompanying the procedures was an assurance of continued employment).
 

 In addition, the policy manual in this case did not create any contractual rights because of the disclaimer at the very beginning of the policy manual. The top of the first page of the policy manual contained the foUowing language:
 

 SECTION 1: APPLICABILITY AND EXCEPTIONS
 

 This Policy and Procedures Manual has been developed to guide employees in carrying out their assignments according to accepted, uniform standards. It also serves to acquaint new employees with office procedures and policies. The contents of this Manual do not constitute a contract and may be changed as deemed appropriate by the General Manager.
 

 This Manual states the official policies of the Illinois .Municipal Electric Agency and applies to all employees. Exceptions to the Manual provisions will be
 
 *189
 
 made only with the written approval of the General Manager.
 

 Illinois courts have recognized that an express, unobscured disclaimer within an employee handbook can be sufficient to show that there was no “clear promise” of continuing employment and, therefore, that the handbook did not create a legitimate claim of entitlement to employment.
 
 Border,
 
 75 F.3d at 273 (citing
 
 Moore v. Illinois Bell Tel. Co.,
 
 155 Ill.App.3d 781, 108 Ill.Dec. 358, 508 N.E.2d 519, 521 (1987),
 
 app. denied,
 
 116 Ill.2d 562, 113 Ill.Dec. 303, 515 N.E.2d 112 (1987)); see also
 
 Boulay,
 
 939 F.2d at 483 (unambiguous disclaimer negates an employee’s contractual expectations);
 
 Svigos,
 
 1996 WL 388416, at *4 (“plain text prevents an employee from reasonably believing that the handbook language could ‘constitute a contract’ ”);
 
 cf. Duldulao,
 
 106 Ill/Dec. 8, 505 N.E.2d at 319 (finding clear promise after noting that handbook contained no disclaimers).
 

 Long correctly notes that Illinois courts do not always enforce disclaimer provisions. See
 
 Wheeler v. Phoenix Co. of Chicago,
 
 276 Ill.App.3d 156, 213 Ill.Dec. 62, 658 N.E.2d 532, 535-37 (1995);
 
 Hicks v. Methodist Med. Ctr.,
 
 229 Ill.App.3d 610, 170 Ill.Dec. 577, 593 N.E.2d 119, 121-22 (1992);
 
 Long v. Tazewell/Pekin Consol. Communication Ctr.,
 
 215 Ill.App.3d 134, 158 Ill.Dec. 798, 574 N.E.2d 1191, 1193-94 (1991);
 
 Perman v. ArcVentures, Inc.,
 
 196 Ill.App.3d 758, 143 Ill.Dec. 910, 554 N.E.2d 982, 987 (1990). However, all of those cases involved a clear, unequivocal promise or a disclaimer which was inconspicuous or ambiguous. See
 
 Border,
 
 75 F.3d at 274-75. In none of the cases Long cites did the court find a contract from non-mandatory handbook language, accompanied by a conspicuous unequivocal disclaimer. See
 
 Spight,
 
 1999 WL 184198, at *5; see also
 
 Weiss v. New York Life Ins. Co.,
 
 1995 WL 115520, at *4 n. 4 (N.D.Ill.1995). The disclaimer language in IMEA’s policy manual was located on the first page and clearly stated that the policy manual was a “guide,” that it did not constitute a contract and that it could be changed as deemed appropriate. This court concludes that the disclaimer was prominently located and conspicuous. See
 
 Holley v. Pansophic Sys., Inc.,
 
 1997 WL 24708, at *3 (disclaimer was conspicuous where it appeared as the final paragraph of a four-page Introduction to the document). Where, as here, the disclaimer is in a prominent position and is clear and unequivocal, a reasonable person should have noticed it and should have known that no enforceable contract right existed.
 
 Finnane,
 
 43 F.Supp.2d at 900; see also
 
 Border,
 
 75 F.3d at 274;
 
 Spight,
 
 1999 WL 184198, at *4-5;
 
 Semerau v. Village of Schiller Park,
 
 210 Ill.App.3d 493, 155 Ill. Dec. 183, 569 N.E.2d 183, 186 (1991),
 
 app. denied,
 
 141 Ill.2d 560, 162 Ill.Dec. 509, 580 N.E.2d 135 (1991). In the absence of clear, mandatory language to the contrary, effect must be given to the disclaimer.
 
 Campbell,
 
 1998 WL 246403, at *7.
 

 L ong also claims that the policy manual’s grievance procedure provided him with an implied contract of termination only for just cause. This court disagrees. The Seventh Circuit has noted that the presence of a grievance procedure in an employee handbook does not indicate for-cause employment, especially in the face of clear “no employment contract” language.
 
 Border,
 
 75 F.3d at 275. Moreover, the court in
 
 Border
 
 noted that a plaintiffs claim based upon grievance procedures fails where he is claiming a property deprivation in the loss of the job, not in the failure to provide grievance procedures.
 
 Border, 75
 
 F.3d at 275. This is because the plaintiff must show entitlement to the job, not just to the procedures.
 
 Border, 75
 
 F.3d at 275; see also
 
 Shell v. Chicago Hous. Auth.,
 
 1996 WL 377071, at *4 (N.D.Ill.1996). Long has failed to show entitlement to his job.
 

 Finally, this court concludes that the language, “[tjhe tenure of every employee shall be contingent upon acceptable conduct and satisfactory performance of
 
 *190
 
 duties,” did not create an implied contract of continued employment, despite the use of the word “tenure.” The Seventh Circuit has discussed identical language and determined that, when read in conjunction with the prominent disclaimer on the first page of the policy manual, this language could not have created a reasonable belief that an offer of continued employment was being made.
 
 Lashbrook,
 
 65 F.3d at 1347; see also
 
 Semerau,
 
 155 Ill.Dec. 183, 569 N.E.2d at 186 (use of word “tenure” in identical phrase did not raise an issue regarding whether the personnel policy manual amounted to a contract of employment where manual stated at outset that the manual was not intended to be a contract).
 

 For all of the above reasons, this court concludes that the language in IMEA’s policy manual does not contain the kind of clear promissory language relied upon by the Illinois Supreme Court in finding an enforceable contract in
 
 Duldulao.
 
 See
 
 Boulay,
 
 939 F.2d at 482. The policy manual did not promise that Long could be discharged only for cause. He was an at-will employee and no implied contract was created. See
 
 Czarnecki,
 
 2000 WL 284002, at *6.
 

 Even considering the July 19, 1996, letter and the policy manual together, Long cannot get over the “clear promise” hurdle. See
 
 Border,
 
 75 F.3d at 276. Long simply has not shown sufficient evidence from which a trier of fact could reasonably infer that he was promised’ continued employment absent good cause for dismissal. See
 
 Border,
 
 75 F.3d at 276. As a result, Long had no contractual right to his job under Illinois law, so he had no property interest in his job under the Constitution. See
 
 Czarnecki
 
 2000 WL 284002, at *6; see also
 
 Miller v. Crystal Lake Park Dist.,
 
 47 F.3d 865, 868 (7th Cir.1995). ' IMEA is entitled to judgment on Long’s due process claims as a matter of law. Consequently, Summary Judgment is GRANTED in favor of IMEA on Counts I and II of Long’s Complaint.
 

 III. STATE LAW CLAIMS FOR BREACH OF CONTRACT
 

 The
 
 Duldulao
 
 analysis is identical under Long’s state law claims for breach of employment contract as it was under his due process claims. See
 
 Churchill v. Waters,
 
 731 F.Supp. 311, 321-22 (C.D.Ill.1990). This court has already concluded that the language of the offer letter and the language in the policy manual did not create a contract of continued employment under Illinois law. Accordingly, summary judgment is GRANTED in favor of IMEA on Counts III and IV of Long’s Complaint.
 

 IT IS THEREFORE ORDERED THAT:
 

 (1) IMEA’s Motion for Summary Judgment (# 15) is GRANTED.
 

 (2) Long’s Motion for Summary Judgment as to Affirmative Defenses (# 19) is DENIED as moot.
 

 (3) Judgment is entered in favor of IMEA and against Long. This case is terminated. The parties shall be responsible for their own court costs.
 

 [1]
 

 . The parties have disputed this point. Long argues that it is unclear whether he was an “employee” or a "Manager” because his position was created after the policy manual was written. In its Statement of Undisputed Facts, IMEA states that “Department Heads and Managers” refers only to the five department heads who head up each of the five respective departments at IMEA. In its Memorandum of Law, IMEA argues that Long was not covered by this provision at all because the Assistant General Manager position was essentially at the same level as the General Manager, who was not covered by the provision. IMEA also argues that if Long was covered at all it was as a “Department Head or Manager.”