JEFFERY CONDON, Plaintiff-Appellant, v. AMERICAN TELEPHONE AND TELEGRAPH COMPANY, INC., Defendant-Appellee.

Second District   No. 2—90—0578

Opinion filed February 6, 1991.—Rehearing denied April 23, 1991.

Robert Gonnella, of Chicago, for appellant.

Tracy D. Kasson, of Rathje, Woodward, Dyer & Burt, of Wheaton (Gary L. Taylor, of counsel), for appellee.

JUSTICE DUNN delivered the opinion of the court:

Plaintiff, Jeffery Condon, appeals from a directed verdict for the defendant, American Telephone and Telegraph Company (AT&T), on plaintiff's claim of breach of an implied contract. At issue in this case is whether an employer may alter policies contained in employment handbooks and manuals to prevent contractual rights in those policies from arising in its employees. In this case the employer, defendant AT&T, altered an existing manual to disclaim any contractual obligation to its employees which may arise by virtue of the policies contained therein. The plaintiff claims that the disclaimers are not valid because AT&T may not alter an existing policy to change the plaintiff's rights and, therefore, AT&T breached an implied contract in those policies when it demoted him. In directing the verdict, the trial court found the disclaimers were valid and prevented any such contractual rights from arising. We affirm. The facts of the case are as follows.

Plaintiff Condon joined the Illinois Bell Company after college as a management trainee in 1966 and thereafter worked in numerous capacities. At that time Illinois Bell was a wholly owned subsidiary of AT&T. Plaintiff left Illinois Bell to work directly for AT&T in 1983. The Bell System contained six "levels" of management. While at AT&T, plaintiff achieved a "third level" field position.

On January 1, 1984, the regional Bell companies were divested from AT&T. Early in 1985, during one of its many corporate reorganizations following divestiture, AT&T eliminated the third level of management from its field operations. Plaintiff was given the option of a transfer to New Jersey as a third level staff manager or to remain in Illinois in a second level position with a guarantee of two years of income protection, which meant his base salary would remain that of a third level manager. Plaintiff chose to stay in Illinois.

Later that year, as a part of this reorganization and downsizing, defendant AT&T offered managers a method of voluntarily terminating their employment called the Managers Income Protection Program (MIPP) in areas where a surplus of employees had been declared. If a manager elected MIPP by the election date deadline of October 4, 1985, the manager would receive severance pay of up to one year's salary based upon his or her years of service. Plaintiff was eligible to receive a full year's salary payable in monthly installments over one or two years.

Plaintiff then inquired of his supervisor, Mr. Richard Kiltz, if he would be able to receive the MIPP offering in one lump sum instead of monthly payments. Mr. Kiltz transmitted this request to his supervisor, Mr. William Lloyd. He later informed Mr. Kiltz that the plaintiff's request was not approved. However, plaintiff was not informed of the denial of his request until after the October 5, 1985, deadline had passed. When plaintiff attempted to elect the MIPP plan as offered, he was told the election date had passed and the offer was no longer available.

Plaintiff was then assigned to a staff position with Dehlia O'Malley as his immediate supervisor beginning January 1, 1986. Up until this time, the plaintiff had been rated as outstanding or excellent in his yearly performance appraisals by his superiors. Ms. O'Malley met with the plaintiff periodically to discuss his performance. On April 14, 1986, Ms. O'Malley expressed her dissatisfaction with the plaintiff's work to the plaintiff. On May 9, 1986, she informed the plaintiff that the problems had not improved.

Plaintiff was temporarily assigned to Cleveland, Ohio, for strike duty during a work stoppage by nonmanagement employees on or

about June 1, 1986. Upon his return he was summoned to Dehlia O'Malley's office and presented with a letter listing a number of deficiencies in his performance. The letter informed him that his performance was unsatisfactory and effective July 1, 1986, he had the option of finding a position elsewhere within AT&T or accepting a demotion to a first level store manager's position and assigned to the Worth, Illinois, phone store. The date on the letter was May 27, 1986. Plaintiff did not see a copy of the letter until his return on June 20, 1986.

Plaintiff attempted to have his job action reviewed by his superiors. He wrote to Ms. O'Malley's superior, Robert Martin, asking for a review of his file and informing Mr. Martin that he would refuse a demotion. On June 30, 1986, Martin wrote back to inform the plaintiff that he concurred in the job action and stated that AT&T would accept his resignation if he did not want to be demoted. Plaintiff wrote back to Martin on July 5, 1986, informing him that he was not resigning and requesting a hearing on his job action. Ms. O'Malley wrote to plaintiff and stated that whether he was resigning or not, his failure to report to the phone store was considered job abandonment and he was terminated.

Plaintiff asserts that the actions of AT&T were in violation of certain written policies contained in personnel and management training manuals, specifically the AT&T Information Systems Managers' Personnel Guide and the Employee Development System/Management Booklet. Those policies contain language requiring the use of certain procedures when dealing with "non-performing" employees. The policies include (a) written notification of deficiency; (b) written improvement plans with objectives and time frames for improvement; and (c) written notification to the employee on the results of the improvement program. These manuals were disseminated to management personnel. As a manager, plaintiff had occasion to utilize or supervise the use of them himself when dealing with lower level management employees or other supervisors. Plaintiff contends these policies created an expectation that he would be treated according to written procedures and that AT&T's actions were in violation of those written procedures.

Plaintiff does not recall seeing disclaimers in either handbook before November 1984, which is a year and a half after the plaintiff moved from Illinois Bell to AT&T. Various portions of the copy of the Manager's Personnel Guide admitted into evidence are marked with issue dates ranging from October 1984 to February 1986. The Managers' Guide has a number of disclaimers.

A general disclaimer is placed on the first page following the table of contents. It has an issuance date of February 1986. Chapter 17 of the Managers' Guide pertains to performance appraisals. It contains a disclaimer on the first page of the chapter which states:

"This section of the *Managers' Personnel Guide*, like all other personnel handbooks published by AT&T, represents internal policy guidelines. It is not a contract or guarantee and should not be construed as such. No employee should construe this section as limiting the right of the company to:

—discharge or discipline, or

—utilize certain procedures in regards to discharge or discipline.

The policies contained in this section can be changed at any time but only by the Vice President of Personnel and Labor."

This chapter has an issue date of November 1984.

Similarly, Chapter 18 of the Managers' Guide, which pertains to termination of employment, contains a disclaimer on the first page of the chapter. That disclaimer states:

"This chapter *** is intended as a general policy statement containing broad internal policy guidelines and not as a contract or commitment. None of the policies/guidelines we set forth herein are exclusive or all-inclusive ***. All policies/ guidelines contained herein may be changed unilaterally at any time ***. Nothing herein should be interpreted as a limitation on the right to discharge or on the procedures for discharge or termination of employees. All management employees are employed 'at will'. They may leave the company at any time for any reason. The company may discharge or terminate them at any time for any reason."

The issue date on this chapter is February 1986.

Plaintiff claims the disclaimers are invalid because they were not contained in the original policy statement disseminated to the plaintiff when he was hired. Plaintiff argues an implied contract arose by virtue of the original policies and AT&T may not unilaterally alter those policies at a later date to negate that implied contract. We believe an employer may unilaterally alter existing policies to disclaim those policies in order to prevent contractual obligations from arising under *Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482. We turn now to our discussion of the issue.

■ Because this case comes to us on appeal from a directed verdict, a special standard of review must be used. In reviewing a verdict directed by the trial court, the evidence must be viewed in the light

most favorable to the nonmoving party, and all inferences will be drawn in favor of the nonmoving party. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) Thus, a directed verdict is proper only when the evidence "so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." (*Pedrick*, 37 Ill. 2d at 510.) Accordingly, we believe the trial court was correct in directing a verdict for the defendant on plaintiff's claim for breach of an implied contract.

■ Plaintiff is claiming an implied contract arose by virtue of AT&T policy handbooks under *Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482. In that case, our supreme court held that, while employment for an indefinite period of time is presumed to be terminable at will, this presumption may be overcome by proof that the parties contracted otherwise. (*Duldulao*, 115 Ill. 2d at 489.) The plaintiff in *Duldulao* alleged that an employee handbook which had been disseminated to all employees and contained specific procedures for dismissal created a contract between the defendant and its employees. The plaintiff claimed her termination violated procedural rights she had by virtue of this implied contract with the defendant.

The court concluded that an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are met. The court set out a three-part test for contract formation:

"First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement." *Duldulao*, 115 Ill. 2d at 490.

The court went on to state that when these conditions are present, the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles, a valid contract is formed. (*Duldulao*, 115 Ill. 2d at 490.) The court noted that no disclaimers were present to negate the promises made. (*Duldulao*, 115 Ill. 2d at 491.) In finding for the plaintiff, our supreme court relied on the reasoning of the supreme court of Minnesota in a similar case, *Pine River State Bank v. Mettille* (Minn. 1983), 333 N.W.2d 622.

Since *Duldulao,* this court has found the presence of disclaimers in an employee handbook or manual negates contract formation under *Duldulao.* (*Moore v. Illinois Bell Telephone Co.* (1987), 155 Ill. App. 3d 781.) In *Moore,* the plaintiffs alleged the defendant, Illinois Bell, breached an implied contract to set incentive pay according to a published incentive plan. However, that plan contained a written disclaimer on the first page of the plan following the title page. The disclaimer stated:

" 'AT&T reserves the right to amend, change, or cancel the Incentive Plan at its discretion. It also reserves the right to reduce, modify, or withhold awards based on individual performance or management modification. The Plan is a statement of management's intent and is not a contract or assurance of compensation.' " (*Moore,* 155 Ill. App. 3d at 783.)

Thus, the incentive plan did not create an implied contract because the first requirement for contract formation under *Duldulao* was lacking. The incentive plan did not "contain a promise clear enough that an employee would reasonably believe that an offer has been made." (*Duldulao,* 115 Ill. 2d at 490.) The disclaimer prevented the incentive plan from being interpreted as creating an implied contract enforceable by the plaintiffs.

In the present case, plaintiff alleges a contract was created between himself and AT&T by virtue of certain personnel and management training manuals specifying procedures to be followed before dismissal or demotion of a "non-performing" employee. The plaintiff contends that the procedures set out in both the AT&T Information Systems Managers' Personnel Guide and the Employee Development System/Management Booklet create a clear promise under *Duldulao* that AT&T would follow those procedures before the dismissal or demotion of an employee. However, these documents both contain clear disclaimers.

Plaintiff does not recall seeing the disclaimers in these handbooks before November 1984, a year and a half after he began working for AT&T. The Managers' Personnel Guide, which contains a number of disclaimers, does not have one issuance date, but rather different portions of the document have different issue dates, the earliest being October 1984. The record before us does not reveal when, in fact, the disclaimers were inserted. Because the record is silent as to whether the disclaimers were present before the plaintiff recalls seeing them in November 1984, viewing the evidence in the light most favorable to the plaintiff the disclaimers cannot be read into the Managers' Personnel Guide until that time. As for the Employee Development Sys-

tem Booklet, the evidence shows it contained a disclaimer from its inception in May 1986 and was disseminated as such. Plaintiff argues the disclaimers were not initially a part of the policy; therefore, AT&T is prohibited from unilaterally altering its policies to disclaim contractual rights under *Duldulao* at a later date. We disagree.

The implied contract which arises under the *Duldulao* doctrine is unilateral in nature. In setting out its test for contract formation, the *Duldulao* court stated in part three of the test that the employee accepts the offer by working or *continuing to work*. (*Duldulao*, 115 Ill. 2d at 490.) The only way an employee could accept an offer by continuing to work is if the employee was already employed and the employer altered an existing policy. Implicit in this requirement is that the employer may unilaterally change its own policies.

As stated previously, the *Duldulao* court relied on the reasoning of the *Pine River* court in reaching its decision. In *Pine River*, the Minnesota Supreme Court also described the contractual relationship which arises between an employee and an employer by virtue of an employee handbook as unilateral. The employer makes the offer through the handbook and the employee accepts that offer by working. The court went on to explain:

"In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer." *Pine River State Bank v. Mettille* (Minn. 1983), 333 N.W.2d at 627.

Plaintiff argues the defendant should not be allowed to change its policy once contractual rights have arisen because to do so would defeat the purpose of *Duldulao*. However, it is clear that neither the *Duldulao* court nor the *Pine River* court meant to limit an employer's right to alter its own policies. Nor are we prepared to hold that once employers create a policy they are not free to change it.

The supreme court of Michigan was faced with a similar question and noted that the definition of "policy" is commonly understood to be a flexible framework for operational guidance, not a perpetually binding contractual obligation. (*In re Certified Question* (1989), 432 Mich. 438, 456, 443 N.W.2d 112, 120.) To hold an employer may not change a policy once it has been created may deter employers from

creating such policies in the first place. The Michigan Supreme Court also noted that in the modern economic climate, the operating policies of a business enterprise must be adaptable and responsive to change. (432 Mich. at 456, 443 N.W.2d at 120.) We agree with these observations.

■ Accordingly, we hold that plaintiff is bound by the disclaimers. The *Duldulao* court stated that, when the three conditions for contract formation are present, the employee's continued work constitutes consideration for the promises contained in the statement. (*Duldulao*, 115 Ill. 2d at 490.) Therefore, the implied contract that arises is unilateral and may be modified or revoked. The plaintiff continued to work after the disclaimers were inserted and is therefore bound by them. See *Duldulao*, 115 Ill. 2d at 490; see also *Bartinikas v. Clarklift of Chicago North, Inc.* (N.D. Ill. 1981), 508 F. Supp. 959.

Plaintiff also contends that, even if the disclaimers are valid, they constitute an affirmative defense and the trial court erred in allowing them into evidence because they were not raised in the defendant's answer. The trial judge did not allow the defendant to amend its pleadings to include the disclaimers as an affirmative defense because he did not believe they constituted an affirmative defense. We agree with the trial court.

■ The test for whether a defense is affirmative and must be pleaded by the defendant was set out by our court in *Worner Agency, Inc. v. Doyle* (1984), 121 Ill. App. 3d 219. The court stated the test is whether the defense gives color to the opposing party's claim and then asserts new matter by which the apparent right is defeated. (*Worner*, 121 Ill. App. 3d at 222.) In *Worner*, the court found that want of consideration is not an affirmative defense because it does not give color to the plaintiff's claim but rather attacks the sufficiency of that claim. (121 Ill. App. 3d at 222-23.) In contrast, the court explained that failure of consideration is an affirmative defense because it impliedly admits the sufficiency of the underlying contract but offers an excuse of the defendant's failure to perform. 121 Ill. App. 3d at 222.

■ The trial court was correct in finding the disclaimers prevented a contract from being formed *ab initio* under *Duldulao*. The disclaimers do not constitute an affirmative defense because they do not give color to the plaintiff's claim of breach of an implied contract under *Duldulao*, but rather prevent a contract from being formed. Thus, the trial court was correct in allowing evidence of the disclaimers to be introduced into evidence at trial.

In sum, the trial court was correct in directing a verdict for the defendant on plaintiff's claim of breach of an implied contract. The disclaimers clearly prevent a contract from being formed under *Duldulao*. AT&T is not bound to follow the policies cited by the plaintiff. AT&T reserved the right to terminate employees for any reason.

The judgment of the circuit court is affirmed.

Affirmed.

UNVERZAGT and BOWMAN, JJ., concur.