**Claudine ROBINSON, Plaintiff–Appellant,**

v.

**ADA S. McKINLEY COMMUNITY SER-VICES, INC., an Illinois corporation, Defendant–Appellee.**

No. 93–2492.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 3, 1994.

Decided March 21, 1994.

James A. Murphy, Jeffrey N. Cole, Andrew T. Staes (argued), Cole & Staes, Chicago, IL, for plaintiff-appellant.

Ronald L. Lipinski (argued), Sarah Elizabeth Rudolph, Seyfarth, Shaw, Fairweather & Geraldson, Marian C. Haney, Mayer, Brown & Platt, Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, ROVNER, Circuit Judge, and MIHM, District Judge.*

MIHM, District Judge.

On April 30, 1979, Ada S. McKinley Community Services, Inc. ("McKinley") hired Claudine Robinson ("Robinson") as director of foster care services. At the time she was hired, Robinson received a letter dated March 29, 1979, from the Director of Children's Services confirming her appointment. The letter stated, "Please be advised that tenure is achieved after the successful completion of 6 (six) months of service with our agency." At this same time, Robinson also received a copy of McKinley's 1978 Personnel Policies Manual (the "1978 Manual"). The 1978 Manual provided:

> [p]ermanent employment status is attained upon successful completion of the tenure probation period with the Agency.

The 1978 Manual defined tenure probation as the period of the first six months of employment. The 1978 Manual also provided that at the end of the tenure probation, the Agency would decide if the employee was to be awarded permanent employment status. In addition, the 1978 Manual outlined the procedures McKinley would follow when disciplining, discharging, or terminating an employee. Robinson successfully completed her six month probationary period.

Years later, McKinley published a new manual. The 1986 Personnel Policies Manual (the "1986 Manual") contained a disclaimer stating:

> The Agency reserves the right to modify or change any of the provisions of this manual at any time without notice to employees. This manual is intended as a general guideline for its employees, however, the Agency may at times depart from the guidelines set forth herein, when it deems such departure to be warranted by circumstances. Nothing contained in this manual is or shall be construed to be a part of any agreement or contract between the Agency and its employees.

In October 1989 McKinley terminated Robinson. *See* McKinley's Statement of Material Facts as to Which There is No Genuine Issue ¶ 8 and Plaintiff's Response to Ada S. McKinley's Statement of Material Facts ¶ 8.

Robinson filed a complaint alleging that McKinley's termination of her breached their employment contract. McKinley moved for summary judgment. The magistrate judge recommended that McKinley's motion for summary judgment be granted, and the district judge adopted the magistrate judge's recommendation with one exception. This appeal followed. On appeal, McKinley argues that the March 29, 1979, letter and the 1978 Manual do not constitute an employment contract. In the alternative, McKinley argues that if an employment contract was formed between Robinson and McKinley based on the letter and the 1978 Manual, then the 1986 Manual containing the express disclaimer effectively modified the 1978 Manual. We review a district court's grant of summary judgment de novo. *Lister v. Stark,* 942 F.2d 1183, 1187 (7th Cir.1991).

An employment relationship without a fixed duration is presumed terminable at will by either party. *Duldulao v. St. Mary of Nazareth Hospital Center,* 115 Ill.2d 482, 106 Ill.Dec. 8, 11, 505 N.E.2d 314, 317 (1987). This presumption can be overcome. In Illinois, an employee handbook can create an enforceable contract if the traditional requirements for contract formation are present. *Id.* 106 Ill.Dec. at 12, 505 N.E.2d at 318. For an employee handbook or other policy statement to form a contract, three requirements must be met:

---

* The Honorable Michael M. Mihm, Chief District Judge from the Central District of Illinois, is sitting by designation.

First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made.

Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer.

Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. *Id.*

The magistrate judge concluded that Robinson failed to satisfy the first requirement of *Duldulao* because the 1978 Manual and letter contained language too ambiguous to create a contract. The district court agreed with the magistrate judge except that the district court thought the letter was not ambiguous.

■ We hold that the March 29, 1979 letter and 1978 Manual contained language clear enough that an employee would reasonably believe that an offer of employment had been made. The letter confirming Robinson's appointment stated that "tenure" would be achieved after working six months with McKinley. The 1978 Manual provided in part:

1. *Permanent Employment Status*—Permanent employment status is attained upon successful completion of the tenure probation period with the Agency. Permanent status affords the employee full Agency benefits, except as they are qualified in this document.

2. *Probationary Status*—Probationary status is a trial period during which the Agency must decide if the employee is to be awarded permanent employment or permanent position status at the end of the period. All types of probationary status are subject to extension at the discretion of the program director and the Executive Director. The following are the types of probation:

a) *Tenure Probation*—Tenure probation is the period of the first six (6) months of employment. The purpose of tenure probation is to provide the supervisor an opportunity to evaluate the employee's capabilities. At the end of the period, the Agency shall decide if the employee

is to be awarded permanent employment status.

After successfully completing a probationary period, a McKinley employee would clearly achieve "permanent employment status" and "tenure."

"Tenure" is "a right, term, or mode of holding or occupying, and 'tenure of an office' means the manner in which it is held, especially with regard to time." BLACK'S LAW DICTIONARY 1469 (6th ed. 1990). Tenure also describes the status afforded to professors upon completion of a trial period and protects them from dismissal without cause or economic reasons. *Id.* Tenure is "[a] faculty appointment for an indefinite period of time." *Id. citing University Educ. Ass'n v. Regents of University of Minnesota,* 353 N.W.2d 534, 540 (Minn.1984). "Tenure ... denotes relinquishment of the employer's unfettered power to terminate the employee's services." *Zumwalt v. Trustees of California State Colleges,* 33 Cal.App.3d 665, 674, 109 Cal.Rptr. 344, 349 (1973). "Permanent" is defined as:

continuing or enduring in the same state, status, place, or the like, without fundamental or marked change; not subject to fluctuation or alteration; fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient. Webster's New International Dictionary 1824 (2nd ed. 1941).

An employee offered "tenure" and "permanent employment status" after completion of a trial period would reasonably conclude that she had attained something more than an at-will status.

McKinley argues that the magistrate judge correctly held that the use of the terms "permanent employment status" and "tenure" merely provided McKinley with a basis for distinguishing those employees entitled to benefits (permanent employees) from those employees not entitled to benefits (probationary employees). Although the 1978 Manual provided that "[p]ermanent status affords the employee full agency benefits, except as they are qualified in this document," the language of the 1978 Manual does not limit the meaning to such a narrow interpretation.

In addition to the use of words "tenure" and "permanent," the 1978 Manual provided a mandatory disciplinary process. With regard to disciplinary probation, the 1978 Manual stated:

An employee who has achieved permanent employment status may have that status suspended as a result of unacceptable conduct or job performance. Supervisors or directors placing employees on disciplinary probation *must* do so in writing stating: 1) the reasons for the action, and 2) a specific period of time for the employee to demonstrate satisfactory job performance. This action *requires* the written approval of the Executive Director. Disciplinary probation does not involve loss of benefits. At the end of the period, the Agency *shall* decide if the employee is to be returned to permanent employment status. (Emphasis added).

The disciplinary, discharge, and termination sections of the 1978 Manual provided sufficiently compulsory and definite terms that an employee would reasonably believe that an offer of something other than at-will employment had been made. Section X of the 1978 Manual provided:

*DISCIPLINARY ACTIONS*—Violations of Agency standards by an employee may warrant disciplinary action. Disciplinary action *shall* be based on objective evidence. The following are the types of disciplinary actions:

A. *ORAL REPRIMAND*—Oral reprimand *shall* be made by the employee's supervisor. A notation of this may be placed in the employee's file.

B. *WRITTEN REPRIMAND*—Written reprimand *shall* consist of formal notice to employees from their supervisor indicating the specific nature of the violation and a recommended plan for remediation. A copy, signed by the employee, *shall* be maintained in the employee's personnel file.

C. *SUSPENSION*—A suspension for disciplinary purposes *shall* be without pay. Suspensions *must* be approved by the Executive Director. Employees *shall* be informed of such action in writing by their program director. A copy of the

suspension notice *shall* be placed in the employee's personnel file.

D. *DISCHARGE*

1. The discharge of an employee may result from willful insubordination, gross misconduct or other failure to meet Agency standards. Discharges *require* the approval of the Executive Director.

2. Notice of discharge *shall* be given in writing by the program director and cosigned by the division director and the Executive Director. The letter *shall* specify the reasons for the action and a copy *shall* be placed in the employee's personnel file. (Emphasis added).

Section XI of the 1978 Manual provided for termination as follows:

D. *TERMINATION*—Termination of employment may be initiated by the supervisor, program director, division director and/or the Executive Director as a result of the following:

1. Discontinuation, reorganization or reduction of an Agency program.

2. Unsatisfactory job performance.

Two (2) weeks' written notice of termination *shall* be given to permanent employees. At the discretion of the Executive Director two weeks' pay must be given in lieu of two weeks' notice. A letter of termination *shall* be signed by the program director, division director and Executive Director and a copy *shall* be placed in the employee's personnel file. Permanent employees who are terminated *shall* be paid for accrued vacation days. It will not be necessary to give advance notice of termination to tenure probationary employees but immediate termination *must* be cleared in advance with the Executive Director. (Emphasis added).

Finally, the subsection on discharge provided:

E. *DISCHARGE*—Discharge occasioned by willful insubordination or gross misconduct *shall* be effective immediately. Discharge *requires* the approval of the Executive Director. Permanent employees *shall* be paid through the last day worked and for accrued vacation days. Tenure probationary employees *shall* be

paid through the last day worked and *shall* not be paid for accrued vacation days. The specific reasons for the discharge *shall* be stated in the discharge letter signed by the program director, division director and the Executive Director, a copy of which *shall* be placed in the employee's file. (Emphasis added).

The 1978 Manual did not contain disclaimers to negate the promises made. *Duldulao,* 106 Ill.Dec. at 13, 505 N.E.2d at 319. An employee would thus reasonably believe that she could not be terminated without certain protections.

As to the second and third requirements of *Duldulao,* McKinley does not deny that Robinson received the 1978 Manual at the time of her hiring. *See* McKinley's Statement of Material Facts as to Which There is No Genuine Issue ¶ 6. Robinson also accepted McKinley's employment offer by beginning work after receiving the letter and 1978 Manual. Therefore, we conclude that an enforceable contract existed between Robinson and McKinley.

McKinley argues that if we determine that the letter and 1978 Manual created an enforceable employment contract between Robinson and McKinley, the 1986 Manual amendment which included an express disclaimer of any contractual obligations between McKinley and its employees had the effect of superseding the 1978 Manual. McKinley relies heavily on *Condon v. American Tel. and Tel. Co.,* 210 Ill.App.3d 701, 155 Ill.Dec. 337, 569 N.E.2d 518 (1991) on this point. In *Condon,* the plaintiff argued that his employer breached an employment contract when it demoted him without following procedures set forth in the company's personnel and management training manuals. After the plaintiff was hired, the company inserted disclaimers in the manuals. The plaintiff argued that the disclaimers were invalid because they were not contained in the original manuals given to him when he was hired. The Illinois Appellate Court rejected the plaintiff's argument and held that "an employer may unilaterally alter existing policies to disclaim those policies in order to prevent contractual obligations from arising under *Duldulao.*" *Id.* 106 Ill.Dec. at 14, 505

N.E.2d at 520. The *Condon* court held that, since the plaintiff continued to work after disclaimers were inserted in the employee handbook, he was bound by them. *Id.* 106 Ill.Dec. at 17, 505 N.E.2d at 523.

We decline to follow *Condon.* We will not follow an Illinois Appellate Court's interpretation of state law if we are convinced that the Illinois Supreme Court would decide the issue differently.

> Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. *Hicks v. Feiock,* 485 U.S. 624, 628 n. 3, 108 S.Ct. 1423, 1428 n. 3, 99 L.Ed.2d 721 (1988) (*quoting West v. American Telephone and Telegraph Co.,* 311 U.S. 223, 237–38, 61 S.Ct. 179, 183–184, 85 L.Ed. 139 (1940)).

*See also Smith v. Navistar International Transportation Corp.,* 957 F.2d 1439, 1443 (7th Cir.1992) (federal courts are not bound by the decisions of a lower state court unless the state's highest court has ruled on the matter); *D'Acquisto v. Washington,* 640 F.Supp. 594, 619 (N.D.Ill.1986) (a federal district court exercising pendent jurisdiction "is bound only by the decisions of the state Supreme Court and by the direction that Supreme Court would take, not by the state appellate courts").

█ We do not believe that the Illinois Supreme Court would recognize a ruling so contrary to basic contract principles and notions of fairness. The Illinois Supreme Court has held that a party may not unilaterally modify a contract:

> There is no doubt that the parties to a contract may by their mutual agreement accept the substitution of a new contract for the old one with the intent to extinguish the obligation of the old contract, but one party to a contract cannot by his own acts release or alter its obligation. The intention must be mutual. *York v. Central Illinois Relief Ass'n,* 340 Ill. 595, 602, 173 N.E. 80 (1930).

A valid modification requires an offer, acceptance, and consideration. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 208 (7th Cir.1985). *See also Todd v. Corporate Life Ins. Co.*, 945 F.2d 204, 208 (7th Cir.1991) (employer could not unilaterally modify employment contract); *MAJS Investment Inc. v. Albany Bank & Trust Co.*, 175 Ill.App.3d 478, 124 Ill.Dec. 918, 920, 529 N.E.2d 1035, 1037 (1988) (for a valid modification of a contract, it must be shown that the parties assented to the terms); *Scutt v. La Salle County Board*, 97 Ill.App.3d 181, 53 Ill.Dec. 21, 25–26, 423 N.E.2d 213, 216–17 (1981) (modification of a contract subject to the rules governing all contracts—offer, acceptance, and consideration); *Brooks v. Village of Wilmette*, 72 Ill.App.3d 753, 28 Ill.Dec. 934, 937, 391 N.E.2d 133, 136 (1979) ("no contract can be modified or amended in an *ex parte* fashion by one of the contracting parties without the knowledge and consent of the remaining party to the agreement"); *People ex rel. Sterba v. Blaser*, 33 Ill.App.3d 1, 337 N.E.2d 410 (1975).

■ The *Condon* court relied on *Duldulao*. But *Duldulao* did not alter basic rules of contract modification. *Duldulao* merely held that if an employer embodies a clear and definite promise in its employee handbook, then an offer has been made. *Condon* also relied on *Bartinikas v. Clarklift of Chicago North, Inc.*, 508 F.Supp. 959 (N.D.Ill. 1981). However, *Bartinikas* recognized that in Illinois, "an employer acting *ex parte*, without the consent of the employee, cannot modify the terms of the employment contract." *Id.* at 961.

A valid modification of the original employment contract between Robinson and McKinley did not occur simply because McKinley unilaterally issued the 1986 Manual containing a disclaimer. Acceptance and consideration cannot be inferred from Robinson's continued work. By continuing to work, Robinson was merely performing her duties under the original contract. According to McKinley's logic, the only way Robinson could preserve her rights under their original employment contract would be to quit working after McKinley unilaterally issued the disclaimer. That is ridiculous.

"There is nothing unlawful about offering a benefit to a promisee in exchange for a modification of the contract; the problematic modifications are those not supported by consideration." *American Hosp. Supply v. Hospital Products Ltd.*, 780 F.2d 589, 599 (7th Cir.1986). If a valid modification of the employment contract between Robinson and McKinley occurred, then Robinson gave up her legal right to tenure, permanent employment status, and the protections of the 1978 Manual. To find consideration to support this purported modification, there must be some benefit to Robinson, detriment to McKinley, or Robinson's continued work under the 1986 Manual must have been a bargained for exchange. There was no consideration here. McKinley does not claim that Robinson received any benefit for giving up her protections, and McKinley did not suffer any detriment. Moreover, there was no bargained for exchange to support Robinson's relinquishment of the protections she was entitled to under the 1978 Manual. Therefore, we find that Robinson's continued work does not constitute consideration for the purported modification.

Courts must look to the tenure agreement to define the rights and duties of the parties. *Williams v. Northwestern University*, 147 Ill.App.3d 374, 100 Ill.Dec. 864, 867, 497 N.E.2d 1226, 1229 (1st Dist.1986). Since the district court found that the letter and 1978 Manual did not create an offer, the district court did not consider whether McKinley followed the termination provisions of the 1978 Manual. Therefore, we remand this case to the district court to determine whether McKinley breached the employment contract created by the letter and 1978 Manual when it terminated Robinson.

Reversed and remanded for further proceedings consistent with this opinion.