DIERDRE HANNA, Plaintiff-Appellant, v. MARSHALL FIELD AND
COMPANY *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—95—2334

Opinion filed March 29, 1996.—Rehearing denied May 21, 1996.

Sheldon Hodes, of Chicago (Leonard D. Litwin, of counsel), for appellant.

Kathleen M. Paravola and Robert J. Mignin, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellees.

JUSTICE GREIMAN delivered the opinion of the court:

Following her discharge from employment, plaintiff Dierdre Hanna filed a three-count complaint against her employers, defendants Marshall Field & Company (Marshall Field) and Dayton Hudson Corporation (Dayton Hudson). Plaintiff alleged causes of action premised on breach of contract for defendants' alleged failure to comply with provisions of certain employee handbooks and personnel policies, false imprisonment and discharge relating to the filing of a worker's compensation claim. After voluntarily dismissing the worker's compensation claim, plaintiff now appeals the entry of summary judgment in favor of defendants on the contract and false imprisonment counts.

Two issues are raised on appeal: (1) whether defendants' personnel handbooks and policies created enforceable contractual rights; and (2) whether defendants' conduct constituted false imprisonment

of plaintiff while she was in an office being questioned by supervisors about the veracity of her time records.

We affirm summary judgment in favor of defendants on both counts, finding that no enforceable contract existed to support a breach of contract claim and defendants' conduct during an office meeting did not constitute false imprisonment.

On January 21, 1992, defendants discharged plaintiff from her job for falsifying time records and receiving pay for time not worked. Defendants did not issue any warnings before discharging plaintiff. Plaintiff had been employed at Marshall Field since September 14, 1981. In 1990, Dayton Hudson became the owner and operator of Marshall Field & Company.

On September 14, 1981, plaintiff was hired as a restaurant supervisor and worked in that position until July 1985 when she sustained a back injury in the course of her employment. With the exception of returning to work for a few days in February 1986, plaintiff did not return to work until May 1987. Upon her return, plaintiff worked as a personnel assistant in the restaurant division and remained there about one year.

About May 1988, plaintiff transferred to Marshall Field's personnel department and worked as an administrative assistant until her discharge in January 1992. Her duties included changing the timekeeping system from a manual to a computerized system, a project estimated to take five years. During her tenure as an administrative assistant, plaintiff was supervised first by Susan Wally until October 1, 1991, and then by Diane Franzese after Wally left Marshall Field's employ.

In her deposition, plaintiff testified that when she began reporting to Wally, she and Wally orally agreed that plaintiff would not charge Marshall Field for any double time when she worked seven days a week or for all of the overtime.

In her affidavit, Susan Wally stated that she held the position of general personnel manager of Marshall Field's State Street store from 1987 until she left in September 1991. Wally attested that plaintiff was not allowed to submit her extra hours when she was working in the restaurant division. Wally further attested:

> "I advised her [plaintiff] in a face to face conversation with her *** that I would pay her for overtime but that I could not pay her for double time even though she would be entitled to it if she worked a Sunday or Seventh day.
>
> [Plaintiff] and I during this conversation reached agreement that she would be paid at time and one half for overtime worked. I was aware that [plaintiff] was working more hours than she was

paid for even under this arrangement because she rarely took days off, rarely took holidays off and had to be ordered to go home at night. I was aware that to avoid double time and excessive overtime [plaintiff] would manipulate her time to the benefit of the company. [Plaintiff] was under reporting her hours. I made my superiors aware of [plaintiff's] time worked and the payment arrangements. The aforesaid agreement and arrangement with [plaintiff] was in effect when I left my position at Marshall Field's."

The week before she left Marshall Field, Wally met with her successor, Diane Franzese, and told Franzese of the payment arrangement with plaintiff regarding how plaintiff "would be paid for overtime and double time worked." Franzese told Wally that "I don't want to change anything; I want her [plaintiff] to do exactly as she has done for you." Wally told plaintiff of her discussion with Franzese.

In her affidavit, Diane Franzese stated that she assumed the position of general personnel manager of the State Street store, replacing Wally, and supervised plaintiff from October 1991 until plaintiff's termination on January 21, 1992. Franzese made the decision to terminate plaintiff. Franzese further stated that shortly after assuming her position of personnel manager:

"[I]t appeared to me [Franzese] that Plaintiff was submitting and receiving substantial overtime compensation for herself despite my directives that no overtime be worked without my prior authorization, and also inputting and making adjustments to her own time. Employees were not to adjust their own time records."

Franzese further acknowledged that she "advised Plaintiff that she could not work overtime without my prior approval and could not make adjustments to her own time records. However, Plaintiff continued to submit substantial amounts of overtime." In addition, Franzese "became aware that [plaintiff] was requesting and receiving payment for hours she was not actually working." Accordingly, Franzese requested that the loss prevention department conduct an investigation of plaintiff's time practices. Ann Treis, an assistant loss prevention manager, then investigated plaintiff's timekeeping records and practices.

In her affidavit, Ann Treis stated that her investigation covered the previous two-month period and revealed that plaintiff had submitted and received payment for days and times when she was not in the building according to the store's sign-in log.

Julie Baublis, by affidavit, attested that in early January 1992 she held the position of investigations coordinator at the State Street store. Baublis was advised of the investigation regarding plaintiff's timekeeping practices and shown documentation which indicated

that plaintiff had submitted time records for herself and other employees for days and times not worked. Treis, the investigator, and Keith White, the loss prevention manager at that time, requested that Baublis interview plaintiff regarding the investigation because Baublis did not know plaintiff and was not part of the loss prevention department.

On January 21, 1992, Baublis telephoned plaintiff at work and requested that she come to her office. After plaintiff arrived, Baublis, Treis and Franzese, in turn, each met individually with plaintiff in Baublis' office. The affidavits of Baublis, Treis and Franzese reveal the following series of events in Baublis' office.

When plaintiff first arrived, Baublis explained that the loss prevention department had conducted an investigation regarding her time submissions and that documentation revealed that she had requested and received payment for days and times during which she and other employees were not at work. Baublis advised plaintiff that this interview was an opportunity for her to tell her side of the facts and to prepare a written statement in this regard. Baublis attested that she left her office after about 20 or 25 minutes and advised White and Treis that plaintiff would not respond to her.

Treis then entered Baublis' office and exited about 45 minutes later with a written statement from plaintiff. Baublis then met with White, Treis, and Franzese for about 15 minutes in another office.

Franzese then entered Baublis' office and met alone with plaintiff for 15 minutes. When Franzese came out, she asked Treis and Baublis to escort plaintiff to her office to collect some of her belongings and then plaintiff was escorted out of the building.

Regarding the events in Baublis' office on January 21, 1992, plaintiff testified that she was in the office about five hours, from 10 a.m. until 3 p.m. Baublis started their meeting "by saying you [plaintiff] are a valued employee, and we don't really think that you did anything wrong." When asked to account for work hours, plaintiff stated that it could be explained if she were allowed to leave to get her book in which she apparently logged her time or if Baublis would call Franzese to "explain how I was working." Baublis said no because "they wanted to get it clear in their minds before anything happened."

Plaintiff then asked if she was being charged with anything and was told "absolutely not." Plaintiff next asked if she was going to be fired and was told that they hoped she would not be fired over something but the situation was like embezzlement of company funds. Plaintiff then asked if she needed to call her lawyer and Baublis said "oh, no, nothing like that." When asked "to sign a paper stating that

I had down [sic] some illegal manipulating of the time clock," plaintiff responded that she would not sign anything.

Baublis left the room and Treis entered to talk to plaintiff. To explain the timekeeping procedure, plaintiff again asked to get her calendar or to call Franzese and Treis refused her request. Plaintiff testified that five hours had passed and she wanted to leave so she then prepared a handwritten statement. Plaintiff next recalled that Franzese entered the room and fired her.

Plaintiff testified that she was not forcibly taken to Baublis' office and that she was never handcuffed, arrested or physically restrained. Plaintiff also recalled that she said she had to go to the bathroom and although she did not remember if they let her leave, she never went. Plaintiff further testified that they said they would bring her anything that she needed to have. Plaintiff requested to leave the room about three or four times and each request was denied. There is no dispute that the office door was never locked and a telephone was in the office.

Following her discharge, plaintiff filed a three-count amended complaint. Count I alleged that plaintiff was unlawfully discharged in contemplation of her filing a worker's compensation claim. After the entry of summary judgment on the other two counts, plaintiff voluntarily dismissed count I.

Count II alleged that defendants failed to discharge plaintiff in compliance with the provisions of employee handbooks. Attached to the complaint and referenced in count II as group exhibit A were copies of Dayton Hudson's employee handbook, Marshall Field's reference handbook and two personnel policies of Marshall Field's dated in 1984. The two personnel policies for Marshall Field's were entitled "Employee Counseling and Discipline" (No. 501—A) and "Discharge" (No. 503—A). In her deposition, plaintiff testified that she received the Marshall Field handbook but did not receive Dayton Hudson's handbook.

Count III alleged plaintiff was falsely imprisoned on January 21, 1992, during the meeting in which she was eventually discharged.

Following a hearing, the trial court granted summary judgment in favor of defendants on counts II and III. Regarding count II, the trial court found that no contract had been established between plaintiff and defendants. Regarding count III, the trial court found that plaintiff "knew that she could leave, except that she might lose her job" and that there was "no present threat" as required by case law.

Plaintiff first asserts that defendants wrongfully discharged her because they used but failed to follow their own procedures for dis-

charge as stated in the Dayton Hudson handbook and in the Marshall Field personnel policies.

Defendants contend that plaintiff was an employee at will subject to termination at any time and no contractual obligations existed between her and her employer.

Summary judgment is proper when the pleadings, depositions and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1992). We apply a *de novo* standard of review to summary judgment orders. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).

Even though a plaintiff need not prove his case at the summary judgment stage, a plaintiff must present some evidentiary facts to support the elements of his cause of action. *E.g., Barker v. Eagle Food Centers, Inc.*, 261 Ill. App. 3d 1068, 1071, 634 N.E.2d 1276 (1994); *Brooks v. Brennan*, 255 Ill. App. 3d 260, 262, 625 N.E.2d 1188 (1994).

■ Illinois law holds that an employee who is hired without a fixed term is presumed to be an employee at will. *Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 489, 505 N.E.2d 314 (1987). The presumption of employment at will, however, "can be overcome by demonstrating that the parties contracted otherwise." *Duldulao*, 115 Ill. 2d at 489.

In accordance with these principles, the Illinois Supreme Court held "that an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present." *Duldulao*, 115 Ill. 2d at 490. Three elements are required to create an enforceable contract between an employee and employer:

> "First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement." *Duldulao*, 115 Ill. 2d at 490.

Disclaimers in an employee handbook or manual, however, negate contract formation under *Duldulao*. *Condon v. American Telephone & Telegraph Co.*, 210 Ill. App. 3d 701, 707, 569 N.E.2d 518 (1991). Moreover, an employer may unilaterally change its own policies. *Condon*, 210 Ill. App. 3d at 708-09. A personnel manual which is never disseminated to the employee cannot form the basis for a

contract. *Gaiser v. Village of Skokie*, 271 Ill. App. 3d 85, 91, 648 N.E.2d 205 (1995).

■ Plaintiff's reliance on the Dayton Hudson handbook as an enforceable contract clearly fails because plaintiff expressly testified that she never received or read a copy of the handbook and it includes a written, specific disclaimer. Plaintiff specifically testified as follows:

"Q. And you never received a copy of the [Dayton Hudson] handbook that's attached to the complaint?

A. No. They [*sic*] were too few to go around, so they were passed around.

Q. You were aware there was a handbook?

A. I assume there was a handbook.

Q. Did you assume it applied to you?

A. I never read it. I am sure it would apply to me, I just never read it."

The Dayton Hudson handbook includes the following express disclaimer:

"The content of this handbook is not a contract between you and The Department Store Division of Dayton Hudson Corporation, nor is it an agreement to provide any benefits described in this handbook. Your employment and compensation may be terminated with or without cause and with or without notice at any time at the option of either you or the company. No manager or other representative of the company other than the senior vice president, Human Resources, has the authority to enter into any agreement contrary to the foregoing. Such an agreement must be in writing and actually signed by the senior vice president, Human Resources, and you. The company reserves the right to alter, amend, modify, change or terminate any of the policies, practices or benefits described in this handbook at any time, with or without notice."

Even assuming that an enforceable contract could be found to exist (which it is not), the above-quoted provision clearly establishes that for an agreement to be valid, it must be in writing and signed by the employee and the vice-president of human resources. Accordingly, plaintiff's reliance on any purported unwritten arrangement between her and her supervisors concerning time-keeping procedures is misplaced.

■ Plaintiff's reliance on the 1984 personnel policies of Marshall Field as an enforceable contract also fails. First, Dayton Hudson's employee handbook post-dated the personnel policies and an employer is allowed to unilaterally change its own policies (*Condon*, 210 Ill. App. 3d at 708-09). The two personnel policies on which plaintiff relies are dated in 1984. In 1990, Dayton Hudson bought Marshall Field. The Dayton Hudson handbook specifically states:

"This handbook is provided to you solely for the purpose of providing general information about the company and certain polices and procedures. This handbook supersedes all previous handbooks."

Accordingly, even assuming that Marshall Field's personnel policies constituted an enforceable contract, the Dayton Hudson handbook, by its written language, annulled any prior policies or handbooks.

In addition, plaintiff testified that she never saw or used the personnel policies on which she now relies. Moreover, the personnel policies were "guidelines" and were "not generally distributed to employees" according to the deposition and affidavit of Franzese.

At best, plaintiff's testimony reveals that she had an understanding that warnings would be issued before an employee would be terminated. Such an understanding fails to create an enforceable promise to satisfy *Duldulao*. See *Evans v. Gurnee Inns, Inc.*, 268 Ill. App. 3d 1098, 1103, 645 N.E.2d 556 (1994).

Under the facts of this case, we find that the personnel policies fail to meet the *Duldulao* test for an enforceable contract to overcome the presumption that plaintiff was an employee at will.

Plaintiff next asserts that she was falsely imprisoned by defendants' personnel during the meeting which ended with her discharge on January 21, 1992. Plaintiff argues that defendants' conduct constituted false imprisonment because her request to call her attorney was denied; her requests to leave the office on three or four occasions were refused; the door was always closed; she was afraid to use the telephone; she was so upset that her cheeks became flushed; she was questioned for five hours; and on the form on which she wrote her statement, she crossed out the phrase "make the following statement FREELY and VOLUNTARILY knowing that it can be used in court. It is made without threats or promises of any kind."

Defendants contend that plaintiff has failed to present any disputed issue of material fact that defendants restrained her against her will and that defendants acted unreasonably. Defendants argue that plaintiff came voluntarily to Baublis' office upon Baublis' request; plaintiff was never forcibly restrained, handcuffed or physically prevented from leaving the office; the door to the office was never locked; plaintiff was left alone in the room with a telephone at various intervals; plaintiff was not threatened with the loss of her job; any delay in the interview process was created by plaintiff's admitted refusal to cooperate with the investigation as evidenced by the fact that her interview was concluded after she prepared her statement; plaintiff was simply asked to provide her explanation of the events, not to make a confession; plaintiff admitted that she was

told that she would be brought anything she needed; the interviews were conducted during working hours; and plaintiff was paid for the entire day (January 21, 1992).

■ The common law tort of false imprisonment is defined as "an unreasonable restraint of an individual's liberty, against his will, caused or procured by the defendant." *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 474, 564 N.E.2d 1222 (1990). The essential elements of a cause of action for false imprisonment are that (1) the plaintiff was restrained by the defendant and (2) the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff. *Meerbrey*, 139 Ill. 2d at 474.

To state the tort of false imprisonment, "the evidence must establish a restraint against the plaintiff's will, as where she yields to force, to the threat of force or the assertion of authority." *Lopez v. Winchell's Donut House*, 126 Ill. App. 3d 46, 51, 466 N.E.2d 1309 (1984).

Voluntary consent to confinement nullifies a claim of false imprisonment. *Lopez*, 126 Ill. App. 3d at 50. Moreover, consent is not invalidated even if an employee is threatened with discharge. See Restatement (Second) of Torts § 892B, Reporter's Note, appendix at 231 (1982). The restraint that results merely from a plaintiff's fear of losing his job or belief that he would be fired immediately if he left the room is insufficient as a matter of law to make out a claim of false imprisonment. *Johnson v. United Parcel Services, Inc.*, 722 F. Supp. 1282, 1284 (D. Md. 1989) (the plaintiff's false imprisonment claim was disposed of on summary judgment where the plaintiff's employer questioned the plaintiff during the evening hours about three or four hours concerning allegations of theft and drug dealing). Furthermore, "it is not enough for the plaintiff to have felt 'compelled' to remain in the" room in which the false imprisonment allegedly occurred. *Lopez*, 126 Ill. App. 3d at 51.

In *Lopez*, this court affirmed summary judgment in favor of the defendant employer where the plaintiff employee alleged a false imprisonment claim. The plaintiff worked as a clerk in the defendant's donut shop. One of the plaintiff's supervisors called the plaintiff at home and asked her to come to the shop but did not offer any reason for his request. When the plaintiff arrived at the shop, she was taken into a room where, according to her deposition, the door was closed and locked with a latch. Two supervisors then questioned her about money shortages in her cash register. When the plaintiff became "too upset" to respond to the questioning, she left. The plaintiff testified that she had voluntarily accompanied the supervisors to the room; she remained in the room to protect her rep-

utation; no one threatened her with the loss of her job; she never feared for her safety; and she was not prevented from leaving the room.

Similarly, in the present case, plaintiff voluntarily responded to Baublis' telephone request to come to her office and was never threatened with the loss of her job. Moreover, unlike the facts in *Lopez*, plaintiff's meeting occurred during work hours; the door to the office was not locked; and plaintiff had access to a telephone. "If you close a person in the room but the person has a key (and knows it), you have not committed false imprisonment." *Albright v. Oliver*, 975 F.2d 343, 346 (7th Cir. 1992), *aff'd*, 510 U.S. 266, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994).

Plaintiff argues that *Lopez* is distinguishable because the plaintiff employee actually left the room in which she was being questioned by her supervisors. We find this distinction unpersuasive in the present case because the present plaintiff could have walked out of the room in the same manner as the *Lopez* plaintiff.

For all the foregoing reasons, we affirm the order of summary judgment in favor of defendants on both counts.

Affirmed.

TULLY and CERDA, JJ., concur.