In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2455

Larry Garcia,

Plaintiff-Appellant,

v.

Kankakee County Housing Authority,
Charles E. Ruch, Jr., and Yvonne Hayes,

Defendants-Appellees.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99-2143--Michael P. McCuskey, Judge.

Argued January 11, 2002--Decided February 1, 2002


   Before Easterbrook, Kanne, and Diane P.
Wood, Circuit Judges.

   Easterbrook, Circuit Judge.  Larry Garcia
worked his way up from warehouse clerk to
Director of Technical Services at the
Kankakee County Housing Authority. During
1998 the Authority was in turmoil; its
Executive Director and all members of its
governing Board quit or were dismissed.
The new Board asked Garcia to serve as
Interim Executive Director, and he
assumed that position on December 4,
1998. Soon Garcia began to make changes
in the Authority's operations, and he
challenged the authority of Charles Ruch,
the Board's new Chairman. Within a week
of his appointment, Garcia started
writing memos to the Board complaining
about Chairman Ruch's conduct and asking
other members to rein in their leader.
For forgetting who was in charge, Garcia
paid a penalty: he lasted exactly 18 days
as Interim Executive Director, and he
lost his job as Director of Technical
Services as well when a majority of the
Board deemed him insubordinate and showed
him the door.
   In this suit under 42 U.S.C. sec. 1983,
Garcia contends that his discharge
violated not only the Constitution's
first amendment but also the due process
clause of the fourteenth. The former
theory is that the Board penalized him

for sending the memos and for attending public meetings at which Chairman Ruch had sought to be the Authority's sole representative. The latter theory is that he had a property interest in his job, which the Board could not affect without notice and an opportunity for a hearing. Garcia actually received an elaborate post-discharge hearing but contends that the outcome was a foregone conclusion. The district court was not persuaded by either theory and granted summary judgment to the defendants.

As the district court saw matters, Garcia and Ruch were engaged in a struggle for control of the Housing Authority. Which of the two would emerge on top was, in the judge's view, a personnel dispute outside the scope of the first amendment. Compare Connick v. Myers, 461 U.S. 138 (1983), with Pickering v. Board of Education, 391 U.S. 563 (1968). Garcia insists, to the contrary, that the dispute concerned how the Authority would be run, rather than who would carry out preordained tasks. For example, the public meetings that Ruch wanted to dominate concerned the possibility of extending the Authority's services to the Pembroke area. That is an issue of public concern, Garcia asserts; and if the subject-matter of the meetings were not enough, he submits that Ruch's principal reason for seeking the limelight was to generate favorable publicity and advance his political career. If a newspaper editorial about the Pembroke project would be protected, Garcia insists, so is his role.

No editorial writer could be fined or imprisoned for taking a stand on the management of the Kankakee Housing Authority, or the extension of its services to Pembroke; nor could a reporter be barred from a meeting open to the public. But Garcia was not fined or imprisoned. He was told that his services are no longer required, but all economic opportunities in the private sector remain open. That is a substantial difference in consequence for the employee--a difference important to public employers as well, for no bureaucracy can function if each employee is a free agent, entitled to undermine the policy set by politically responsible officials. See Waters v. Churchill, 511 U.S. 661, 672-75 (1994) (plurality

opinion). If as Garcia contends the struggle within the Housing Authority was about goals and their implementation, then the Board was entitled to fire him without transgressing the Constitution. Although the first amendment protects rank-and-file employees from discharge for taking a public stand on how the agency should be managed, it does not protect those who act on their views, to the detriment of the agency's operations; nor does it protect even the abstract statements of those top employees who are responsible for setting objectives and implementing political decisions. A Cabinet officer who published an op-ed piece contrary to the President's program could be fired, even if the essay had nothing to do with that agency's portfolio (for example, a Secretary of Education who made a speech denouncing the President's economic stimulus proposals). The Supreme Court has held that all policy-making officials, and some others, may be required on pain of dismissal to give both public and private support to thepolitical agenda of those who hold elected office, and their top appointees. The Court has yet to articulate a rule for how far this circle of conformity extends, but it includes all employees whose views can promote or defeat a political program. See Branti v. Finkel, 445 U.S. 507, 518 (1980); Wilbur v. Mahan, 3 F.3d 214 (7th Cir. 1993).

The Executive Director of a public agency fits that description--more securely than, say, the deputy director of a bureaucracy, a position that we have held may be limited to those who hold views sympathetic with elected officials. See, e.g., Tomczak v. Chicago, 765 F.2d 633 (7th Cir. 1985) (deputy head of water bureau); Upton v. Thompson, 930 F.2d 1209, 1215-17 (7th Cir. 1991) (deputy sheriff); cf. Livas v. Petka, 711 F.2d 798 (7th Cir. 1983) (assistant state'sattorney). So Garcia's failure to support Chairman Ruch could have been a basis for his discharge; what is more, Garcia acted on his views, countermanding Ruch's instructions within the Agency. This demonstrates either that Garcia was a policymaking official (who could be fired for political views even on the broadest reading of Elrod v. Burns, 427 U.S. 347 (1976), and its sequels) or that he was gumming up the works despite lack of discretionary authority, and could be

fired for that reason. It makes no difference whether Garcia knew more (or knew better) than Ruch about how to run a public housing agency. Many bureaucrats think that they can manage the organization better than political leaders (and often the bureaucrats are right), but those who have been elected by the populace (or appointed by elected officials) are entitled to make policy even if that means making mistakes. The first amendment does not frustrate democracy by requiring elected officials to tolerate what they reasonably perceive as subversion by bureaucrats. Nor does the first amendment prevent political officials from insisting that "interim" appointees speak and act like caretakers.

This leaves Garcia's contention that he had a property interest in his job, an interest that under the due process clause he could keep until the Authority provided notice and an opportunity for a hearing. It is hard to see where this gets Garcia, because he had a hearing before his discharge became final. True, he was removed from office about a month before the hearing, but he was paid for that period and thus has no complaint about the delay. See Gilbert v. Homar, 520 U.S. 924 (1997). The hearing also offered him an opportunity to clear his name, squelching any contention that the discharge unconstitutionally besmirched his reputation. See Codd v. Velger, 429 U.S. 624 (1977). What Garcia really wants from this litigation is not another hearing but his job. Yet the Constitution does not require states to keep all promises made in their contracts and regulations. See Mid-American Waste Systems, Inc. v. Gary, 49 F.3d 286 (7th Cir. 1995); Shegog v. Chicago Board of Education, 194 F.3d 836 (7th Cir. 1999). To put this otherwise, a unit of state or local government does not violate the federal Constitution just because it violates a state or local law, including the law of contracts. See Archie v. Racine, 847 F.2d 1211, 1215-18 (7th Cir. 1988) (en banc).

For what it may be worth, we add that Garcia lacked any "property" interest in his position, and the due process clause therefore did not require a hearing. No statute, regulation, or individually negotiated contract gave him tenure or the right to stay unless the Authority

demonstrated cause for his removal. See Board of Regents v. Roth, 408 U.S. 564 (1972); Upadhya v. Langenberg, 834 F.2d 661 (7th Cir. 1987). Garcia sees the necessary legitimate claim of entitlement in a combination of the Authority's personnel manual and an oral promise that he could return to his position as Director of Technical Services once the Authority hired a new permanent Executive Director. Whether such a promise was made is a subject of dispute, but we may assume that it was. Still, Garcia was an employee at will in that position too, unless the personnel manual gave him some protection. So the oral promise is irrelevant; only the manual matters.

Illinois treats employment handbooks as having the potential to form contracts between employers and workers. See Duldulao v. Saint Mary of Nazareth Hospital, 115 Ill. 2d 482, 505 N.E.2d 314 (1987). A clear promise in a handbook therefore creates legal entitlements. Like the parties to other contracts, however, the parties to an employment handbook may elect to keep their affairs out of court. Page 2 of the handbook exercises this option:

This Manual creates no rights, contractual or otherwise, between the Authority, any prospective or current employee, or any other person. Statements of policy contained in this Manual are not made for the purpose of inducing any person to become or remain an employee of the Authority, and should not be considered "promises" or granting "property" rights. Nothing contained in this Manual impairs the right of an employee or the Authority, to terminate the employment relationship at will. . . .

The following policies and procedures state current policy and are not themselves to be considered or interpreted as terms of an implied or express contract. The Authority reserves the right to amend, modify and/or revoke any of its policies, practices, procedures and standards summarized in this handbook.

Disclaimers of this kind are enough in Illinois to show that the handbook does

not create legal rights. Davis v. Times Mirror Magazines, Inc., 297 Ill. App. 3d 488, 498, 697 N.E.2d 380, 388 (1st Dist. 1998); Condon v. AT&T Co., 210 Ill. App. 3d 701, 707, 569 N.E.2d 518, 521 (2d Dist. 1991). See also, e.g., Workman v. United Parcel Service, Inc., 234 F.3d 998 (7th Cir. 2000) (Indiana law).

According to Garcia, the Housing Authority took back the disclaimer (or at least created an internal contradiction) several pages later, when the handbook said that employees could expect to keep their jobs as long as they performed well, and that an employee could have a hearing before a discharge became final. Garcia's predecessor as Executive Director filed an affidavit stating that the Housing Authority never fired anyone without a good reason. That may be true as a factual proposition but the affidavit and the assurances do not contradict the handbook's statement that all employment is at will. To say that employment is "at will" does not mean that the employer randomly or maliciously discharges good workers; that would serve no one's interests. Employment is "at will" when the term of the arrangement is open-ended, and there are no legal remedies for bringing the arrangement to a close. See Richard A. Epstein, In Defense of the Contract at Will, 51 U. Chi. L. Rev. 947 (1984). Employer and employee have an equal right to end the relation at any time, for any lawful reason. Both employer and employee will want to continue a satisfactory arrangement; thus an employer rarely fires anyone without thinking that it has a good reason. All it means to say that the arrangement is "at will" is that courts do not inquire into the sufficiency of that belief. Judges and juries are not guaranteed to do better than supervisors at determining whether an employee had worked out in the position; and as the legal process is expensive (including the expense of error), both employer and employee may gain from saving those costs. Perhaps the Housing Authority made a mistake in not returning Garcia to his former post as Director of Technical Services, but under the handbook the penalty for any mistake will be paid in the market (because the Authority will have a harder time recruiting a quality replacement, or will need to pay more to make up for the

greater uncertainty) rather than in the courts.

Affirmed